ANNA BAKER, Appellant, v. GENERAL AMERICAN LIFE INSURANCE COMPANY, Successor to Missouri State Life Insurance Company, Appellee.

No. 43486.

JULY 31, 1936.

REHEARING DENIED NOVEMBER 19, 1936.

Raymond N. Klass, for appellant.

Grimm, Elliott, Shuttleworth & Ingersoll, for appellee.

HAMILTON, J.—This is a law action, brought by the plaintiff to recover the death benefit alleged to have accrued to her as beneficiary named in a policy of insurance upon the life of her son, Kenneth F. Baker, issued by the Missouri State Life Insurance Company. The original policy was $1,000, 20 payment life, to which was attached a supplementary agreement providing for double indemnity accidental death benefit. The annual premium was $28.80 which by the terms of the policy was payable in ad-

vance on the 25th of May, either at the home office of the company in St. Louis, Missouri, or to an authorized agent of the company upon delivery of a receipt signed by the president or secretary and countersigned by such agent. Thirteen annual payments of premium had been made. The fourteenth premium became due May 25, 1933. There was loaned on the policy $231, being the full cash value at the end of the thirteenth premium year. The interest was payable in advance and hence on this date there was interest due of $13.86. The policy was a participating one, and at this date dividends totaling $11.13 were due assured. He died September 27, 1933.

Appellee has by motion asked that the appeal be dismissed for failure on the part of appellant to observe the rules of this court with reference to assignment of errors. Counsel for appellant, in attempting to set forth the errors relied upon for reversal, under the title ''Errors and Grounds Relied on for Reversal'' sets forth a general assignment of so-called errors, numbered from I to VII. Immediately following this he sets forth Error No. I followed by a list of authorities, and following this is his argument, and this form is continued as to all errors assigned. No reference is made to ''so much of the record as refers'' to the particular error, ''with the ruling of the court thereon'' as required by the fifth provision of Rule 30.

In dealing with this matter of enforcing its rules, the court quite often finds itself caught ''in a strait betwixt two''— a desire (a) to be fair and impartial in our treatment of all practitioners, and (b) to avoid inflicting unjust punishment upon litigants because of the failure of attorneys to observe the rules of the court. We fear a close scrutiny of our opinions will reveal the practice quite often followed by the court, that where a reading of the record convinces us that an affirmance would be necessary in any event, to sustain the motion to dismiss and provide a soft place for appellant to light by following our ruling with the soothing words, ''we have however read the record and find nothing which would justify a reversal''; whereas, if there are serious errors noted, and, upon examination of the record, we see that a grave injustice will follow if the appeal is dismissed, prompted by the desire to do justice, the court has been prone to overlook the infraction of its rules in the interest of justice, and thereby subjected itself to the criticism of failing to act impartially. And this practice on the part of the court leads

inevitably to carelessness on the part of attorneys in observing the rules of the court. There would seem to be no way of avoiding this result unless the court foregoes all liberality and becomes arbitrary, or practitioners become more alert and careful in regard to the observance of the rules.

"Considering the tremendous effort which attorneys put into legal research so as to properly argue on appeal, it is indeed surprising that the hazardous task of assigning errors has not been given more attention." Hon. Mason Ladd, in XXI, Iowa Law Review, page 702.

Perhaps, in view of the recent revision of the rules, some leniency is due attorneys until the profession becomes more familiar with the new rules; but may we not hope for a more careful reading and study of these new rules? We realize that any rule is difficult of application in some cases, but even in such cases, there should be a good faith effort to follow the rules as far as practicable.

In the instant case, the application of the fifth provision of Rule 30 was fraught with considerable difficulty, due to the fact that the motion to direct a verdict contained some twenty different grounds and same was sustained generally, and the issues were such that the sustaining of the motion presents to us mostly a solution of legal questions, and appellant's assignments of error are in the main statements of abstract legal propositions, but she fails to connect them with the present record.

Appellant's legal propositions embodied in the first three alleged errors are: That the burden of proof was on the defendant to establish forfeiture of the policy for failure to pay the 1933 premium, and foreclosure of the policy loan; and since the insured is dead, and the proof of this issue lies peculiarly within the knowledge of the defendant, that therefore, unless the plaintiff admits, proves, or concedes nonpayment of premium, the trial court could not direct a verdict in favor of the party (defendant) with the burden of proof; and although defendant's evidence was uncontradicted, and although there was no evidence of payment, and no evidence in conflict with that introduced by defendant, that there still remained the question of the credibility of defendant's witnesses, and this alone made out a case for the jury. And appellant's argument is based on the assumption that all his legal propositions are well founded.

First of all, his whole argument contains a false assumption that the fact that insured is dead brings the case within the rule announced. It is true the insured is dead and cannot speak, but this does not mean that there are no other means of refuting the testimony of defendant's witnesses as to nonpayment of premium or interest. The policy provides how premium shall be paid— "upon delivery of a receipt signed by the president or secretary," or if payment is made to a duly authorized agent, the receipt shall be countersigned by such agent. Nearly everyone carries insurance of some kind, and it is a matter of common knowledge that premium receipts are issued. Usually payment is made, not in currency, but by check or draft, which could be produced. So the fact is that the proof of payment, if actually made, would lie peculiarly within the knowledge and possession of the insured. Under such circumstances it would be much easier for the plaintiff to prove payment than for the defendant to prove a negative of nonpayment, as its books and records would contain no entry. The evidence of defendant on this issue is uncontradicted and establishes by clear, convincing and satisfactory, competent proof that neither the premium nor the interest was ever paid. Every reasonable and necessary requirement of the law was complied with by the defendant in the presentation of its evidence, negativing payment of these items. Absolute certainty is not required. Most surely defendant made out a prima facie case on the issue of nonpayment of these items, and plaintiff offered nothing to rebut it.

■■■ The fundamental principle involved in passing on a motion to direct a verdict in favor of one on whom the burden of proof rests is the same in each and every case. The difficulty arises in its application. But when the evidence all points in one direction, is not in material conflict on the issues involved, and there are no circumstances which tend to impair or impeach the same, and is not susceptible of inherent weaknesses, improbabilities and incongruities, which in and of themselves naturally arise to contradict or impeach the weight and credibility of the utterances of the witnesses, then it can most certainly be said as a matter of law that the record presents a case about which the minds of reasonable men cannot differ, and the court is, under such circumstances, warranted in directing a verdict, and there is no sound principle standing in the way of such action on the part of the court. And while there are some statements in

the books to the effect that "It is a rare occasion which justifies a court in directing a verdict upon a fact issue in favor of the party on whom rests the burden of proof," (Connelly v. Greenfield Savings Bank, 192 Iowa 876, 185 N. W. 887, 889), and "a mere failure to produce *direct* contradiction to the testimony of a witness does not necessarily entitle such testimony to be deemed true." (The reason why:) "It must still stand the test of credibility, in the light of all the circumstances surrounding the transaction. This is particularly true in those cases where, from its very nature, no evidence is available to the adverse party to contradict such testimony. * * * Circumstances may be produced and relied on to show improbability and unreasonableness and inconsistency, and the nature of such circumstances is as varied, and the scope thereof as wide, as the field of human affairs," (Schulte v. Ideal Food Prod. Co., 203 Iowa 676, 213 N. W. 431, 432), yet in all these cases in which such statements are found, there have been circumstances or physical facts or inherent weaknesses which raised a conflict between the words spoken by the witness and the evidentiary inferences arising from such circumstances, physical facts or inherent weaknesses; and hence it could not be said there was no conflict in the evidence. Such an element of conflicting proof was present in each and every case cited and relied on by appellant, and when this thought is kept in mind, there is really no variance in such pronouncements from that laid down in Kern v. Kiefer, 204 Iowa 490, 492, 215 N. W. 607, 608, wherein this court said:

"A verdict should be directed: 1. Where but one reasonable conclusion can be drawn from the proof adduced. 2. Where the questions of fact are clearly established by unconflicting evidence. 3. Where there is no substantial evidence to overcome a prima-facie case. 4. Where by giving the opposite party the benefit of the most favorable view of the evidence the verdict against him is demanded." (Citing cases.)

This doctrine was re-announced in Hunt, Hill & Betts v. Moore, 213 Iowa 1323, 239 N. W. 112.

In the case of Summitt v. Insurance Co., 123 Iowa 681, at page 689, 99 N. W. 563, 566, this court said:

"There is no pretense that the insured ever paid any of the premiums save the first one. Defendant has shown the giving

of the requisite notice, * * * and we think has sufficiently shown the nonpayment of the premium in response thereto. True, the evidence as to nonpayment is not absolutely conclusive, but, remembering that the fact of nonpayment is more difficult to prove than payment, we think it was sufficient, especially in view of the fact that there is no affirmative claim on behalf of the plaintiff that any premium * * * was ever paid.

"Plaintiff is evidently relying on defendant's inability to prove a forfeiture * * *, and, as defendant has shown substantial compliance with that law, and offered such proof as was in its possession regarding nonpayment of premiums, we think it made out at least a prima facie case, and that a verdict for the plaintiff on such a showing could not have been sustained."

It would unduly extend this opinion to attempt to traverse specifically all of the contentions of appellant's counsel set forth in his brief and argument. In view of the unusually caustic and inflammatory statements in argument, attributed to the conduct of the insurance company, we have very carefully and laboriously searched the record for some evidence which might cast suspicion or in some way impair or impeach the statements and conduct of the officers who were witnesses on behalf of the defendant, and there is no such inference which can be reasonably drawn from a consideration of the evidence in this case. The record, on the contrary, shows every courtesy was extended and every effort made to induce the insured to re-instate his lapsed policy. His attention was called to the $11.13 dividend and to the provision in the policy for quarterly and semi-annual premium payments. There is no evidence that he was sick, or of any existing condition making it extra-hazardous to continue this risk. The assured had already drawn every dollar of loan or cash value available on the policy. He told an agent of the company who talked to him that he could not pay the premium or interest due. The company did nothing of a surreptitious or fraudulent nature, and despite the disparaging remarks of appellant, we can see nothing that raises any question as to the good faith of its acts and conduct in connection therewith.

After reading the record and examining the original exhibits introduced in evidence in this case, there can not be a particle of doubt in anyone's mind on the question of nonpayment of premium or interest on the loan. Therefore, it matters not what

view the trial court took as to which party was required to sustain the burden as to nonpayment and forfeiture. His action in directing a verdict on this issue was in any event well founded.

The real basis of this lawsuit is found in assignments IV and V.

██ This was a participating policy. Dividends of $11.13 had accumulated and were due and owing to the assured on the date the policy lapsed, to wit, June 25, 1933. The provisions of the policy pertinent are as follows:

"THIS POLICY SHARES ANNUALLY IN THE PROFITS OF THE COMPANY, as follows:

"At the end of the second and of each subsequent policy year, this policy, if in full force, will be credited with a cash dividend from the surplus then apportioned by the company to policies of the same age and kind, and the insured shall have the following

DIVIDEND OPTIONS:

"1. Draw the dividend in cash; or,

"2. Apply the dividend in reduction of premium; or,

"3. Apply the dividend to the purchase of a profit-sharing paid-up insurance addition, increasing the insurance hereunder; or,

"4. Leave the dividend on deposit with the Company to accumulate at interest, the entire accumulation, or any part thereof, to be payable in cash to the insured at any time, on demand.

"Any dividend not drawn or applied as per Option 1, 2, or 3 above, within one month from the date when credited, shall become an interest bearing deposit as per Option 4."

"Dividend Deposits. Dividend deposits may remain with the Company at interest while this policy remains in force, becoming payable in cash in any event upon the discontinuance of this policy—to the beneficiary if this policy matures as a death claim, otherwise to the insured. Provided, that no premium shall be construed as paid either wholly or in part, nor any insurance hereunder extended or continued in force, by reason of any dividend deposits remaining with the Company."

"Automatic Premium Loans. The company will advance any and all premiums becoming due hereon and remaining unpaid on the last day of the period of grace hereunder, and will charge such premium or premiums as a loan against this policy.

together with interest at six per cent per annum in advance to the end of the current policy year, if written request from the insured on the Company's form has been received at the Home Office, while this policy is in full force; provided, that the Company will not so advance and charge up a premium, if the amount thereof and interest thereon, as aforesaid, together with any outstanding indebtedness hereon to the Company, shall exceed the cash value of this policy at the end of the period which such premium, if advanced or paid, would cover. * * *''

There is no claim that the insured exercised the privileges of Options 1, 2, and 3 within the above specified time, and therefore, by his failure to do so under the terms of the policy, Option 4 automatically was put in operation, and we are therefore to deal with this dividend as an interest bearing deposit under Option 4 and to determine whether or not the plaintiff beneficiary is correct in her contention that it was the duty of the company to prevent the policy from lapsing by applying the $11.13 dividend to purchase extended term insurance which she claims would have carried the policy beyond the date of the death of the insured or whether the company is correct in its claim that it had neither the right nor the power to take these dividends and apply them in some other or different manner than is provided by Option 4, namely, to pay in cash to the assured at any time on demand. These provisions of the policy constitute and are the binding terms of the contract between the insured and the company. There is nothing ambiguous in the language used, and there is little, if any, room for construction. Counsel for appellant contends that while the policy does provide that the dividends could be left on deposit at three per cent interest so long as the policy continued in force, and also provided that such dividends on deposit did not provide extended insurance, there was no provision in the policy against off-setting or crediting such dividends upon the policy loan, and that the scheduled loan value shown in the policy at the end of the 13th year was $231, and the loan was in the same amount; that had the company at the time of the alleged lapse credited as an off-set against the policy loan the $11.13 dividend, there would have been $11.13 of loan value which would have provided extended insurance beyond the date of the death.

The evidence shows that notice was duly mailed to the in-

sured, notifying him of the premium due and of the interest due, and also notice of forfeiture, and in which said notice it is stated: ''Inasmuch as the amount of the loan outstanding on your policy equals the present available cash value, the policy will be void in accordance with its terms unless the interest is paid within 31 days from the due date appearing on this notice.'' The date on the notice was May 25, 1933. Long after the policy had lapsed, to wit, on August 4th, the company again wrote Baker, in which they stated that ''in accordance with the terms of the policy, if you will complete the attached application for reinstatement and return it to us with your remittance for the amount past due, we shall be glad to consider placing the protection in force again. If you cannot send us the entire amount, send us what you can, and we shall try to work out a plan for restoring your protection.'' To this letter is attached a postscript which reads as follows: ''If you prefer, you may forward the interest and the semiannual premium of $14.98 or the quarterly premium of $7.63. The dividend of $11.13 can be applied as part of the amount overdue reducing the semiannual premium and interest to $17.71 or the quarterly premium and interest to $10.36.'' It is the contention of appellant that this postscript shows that the company had interpreted the policy to mean that they were authorized to use the $11.13 to apply on the premium. However, on the dividend statements that were sent out to the insured on May 25, 1933, showing the total dividends on deposit available to be $11.13, there was stamped in red letters this statement: ''No dividends can be used to pay a premium unless this voucher is promptly signed.'' Above the place for the signature are these words: ''Apply $———— of dividends to reduce premium.''

That the insured was cognizant of the terms of the policy and of the necessity of his signing is likewise evidenced by his signature to the dividend statement of May 25, 1931, of $6.79. So there is nothing in appellant's theory that the parties to the contract have interpreted it any differently than the plain terms thereof import, which terms were that the dividend could only be paid in cash under Option 4 upon demand of the insured. Any payment by the company or application of said dividend other than that authorized by the insured would not have been binding upon him.

It is the contention of appellant that the company was the

creditor and the insured the debtor as to this money advanced by way of loan on policy, and that it was the duty of the company to credit the indebtedness which it held against Baker with the $11.13 which the company owed him. This rule has no application to money advanced by way of loan to the extent of the cash value available under the terms of the policy, for the simple reason that the relation of debtor and creditor does not exist.

A case almost identical with the case at bar was before the Supreme Court of the United States, entitled Williams v. Union Central Life Insurance Company, 291 U. S. 170, 54 S. Ct. 348, 351, 78 L. Ed. 711, 92 A. L. R. 693, the opinion in which, written by Justice Hughes, was handed down in January of 1934, where the option provisions were practically the same as those in the policy before us, and the court said:

"If, after the lapse and during the life of the insured, the company had attempted to apply that dividend to extended insurance, its action would not have been binding upon the insured and he would have been entitled to demand the cash payment explicitly promised him. * * * The company had no right, without agreement with the insured, to apply a dividend, payable in cash, to the reduction of the advance against the policy. * * * It is the contention of the petitioner that, on the lapse of the policy, the dividend of $74.80 should have been applied in reduction of the amount advanced against the surrender value of the policy, thus raising what remained of that value from $11.12 to $85.92, a sum sufficient to extend the insurance until after the death. But the policy gave no warrant for an application of the dividend to the reduction of advances against the policy. As this court pointed out in Board of Assessors of Orleans County v. New York Life Insurance Co., 216 U. S. 517, 522, 30 S. Ct. 385, 386, 54 L. Ed. 597, such advances being against the surrender value do not create a 'personal liability' or a 'debt' of the insured, but are merely a deduction from the sum that the company 'ultimately must pay.' While the advance is called a 'loan' and interest is computed in settling the account, 'the item never could be sued for,' and in substance 'is a payment, not a loan'."

In the case of Gardner v. National Life Insurance Company, (1931) 201 N. C. 716, 161 S. E. 308, 310, which is another case

in point, containing options similar to those of the policy under investigation, the court said:

"He elected that the dividend should remain with the defendant, at interest, in accordance with his direction given in his application for the policy. In view of the express provisions of the contract between the insured and the defendant, as clearly and plainly expressed in the policy, the defendant had no right, in law or in equity, to apply the dividend declared prior to May 11, 1930, and due at said date, as a payment on the semiannual premium due on May 11, 1930, or to the purchase of extended insurance. If in violation of its contract with the insured, with respect to this dividend, the defendant had so applied it, it would have nevertheless been liable to the insured for the amount of the dividend, with interest, when called upon by him for its payment."

We find nothing in the terms of the policy which would authorize the company to violate its terms and to pay or apply the dividends which the insured had elected to leave on deposit with the company and which under the terms of the policy were payable in cash to the insured on demand, and which could not be applied by the company in any other way. The test is, had the company applied or credited the dividend on the loan as plaintiff now contends it should have done, and the assured had lived beyond the period which the policy would thereby have been extended as claimed, and then the policy finally lapsed, could the assured or his estate recover the dividend? Under the foregoing authorities, this would have to be answered in the affirmative.

Appellant's theory is founded on a false premise for this further reason: It fails to take into account the interest due on the loan of $13.86, which, added to the loan of $231.00, brought the total indebtedness against this policy to $244.86, and when the $11.13 dividend is credited on this, it still leaves $233.73, which exceeds the total loan value available. Appellant's theory under the "automatic Premium Loans" provisions of the policy is subject to the same weakness.

■■■ The result reached makes it unnecessary to pass on the motion to dismiss. Appellee's motion to strike amendment to appellant's brief and argument is sustained. Appellant may not by this method after the case had been fully argued amend the

assignments of error set forth in her original brief. Blomgren v. City of Ottumwa, 209 Iowa 9, 227 N. W. 823. This disposes of the case. Assignments of error, Nos. VI and VII are entirely too indefinite to warrant the court in considering them.

It follows that the order and judgment of the trial court must be and is affirmed.—Affirmed.

PARSONS, C. J., and MITCHELL, DONEGAN, KINTZINGER, RICHARDS, and STIGER, JJ., concur.