AVOCA STATE BANK, Appellee,

v.

MERCHANTS MUTUAL BONDING COMPANY, Appellant.

No. 2–57959.

Supreme Court of Iowa.

March 16, 1977.

Smith, Peterson, Beckman, Willson & Peterson by Frank W. Pechacek, Jr., Council Bluffs, for appellant.

Peters, Campbell & Pearson by Peter J. Peters and Dennis M. Gray, Council Bluffs, and Milton L. Hanson, Avoca, for appellee.

UHLENHOPP, Justice.

This appeal involves the issue of a bank's right to recover damages from a warehouseman's surety on account of issuance of invalid warehouse receipts by the warehouseman. Other cases involving this bond are *True v. Merchants Mut. Bonding Co.*, 251 N.W.2d 543 (Iowa), and *Michael v. Merchants Mut. Bonding Co.*, 251 N.W.2d 531 (Iowa).

In 1971, Claude W. Myler entered into the grain business at Avoca, Iowa. He leased an elevator facility. He had very little capital and financed his operation by borrowing from plaintiff Avoca State Bank, ordinarily posting warehouse receipts or accounts receivable as security. The bank also took a security interest in his assets. Myler also had trucks which he used to transport grain.

Myler would buy grain from farmers and sell it at terminal elevators at a markup, he hoped, of 12 cents per bushel, to cover expenses, transportation, and profit. He trucked some grain directly from the farm to the terminal. Other grain, however, he trucked to his elevator, where he stored it for periods of time while financing it with the bank.

Myler applied to the Iowa Commerce Commission for a license as a warehouseman under chapter 543 of the Iowa Code. This required him to post a warehouseman's bond. Defendant Merchants Mutual Bonding Company signed a bond as surety, and the Commission issued a license. The amount of the bond, as amended, was $52,-000. As required by § 543.28 of the Code, Myler established his tariffs (as No. W-3545). See Iowa C.C. Rule 12.17(543), 1971 I.D.R. 127.

Ordinarily Myler would pay farmers for grain by check. If he immediately re-sold grain, he would ordinarily deposit with the bank the check he received from the terminal to cover his own check to the farmer. If however he received the grain into his elevator, he would ordinarily issue a warehouse receipt to himself, as permitted by § 543.20 of the Code, and then pledge the receipt to the bank as security for a loan to cover the check to the farmer. Upon subsequent sale of such grain to a terminal, he would take the terminal's check to the bank to pay off the loan, and pick up the warehouse receipt.

In common with the experience of some other country elevator operators, *Farmers Co-op. Elevator, Inc. v. State Bank,* 236 N.W.2d 674 (Iowa), Myler went behind. The losses resulted in reduction of grain in the elevator as compared to outstanding warehouse receipts.

This case involves 26 warehouse receipts pledged to the Avoca State Bank as collateral for three unpaid notes the bank now holds. All of the receipts recite that Myler received specified grain for storage. The first receipts are Nos. 78 and 83. Receipt 78 came to the bank as collateral on January 22, 1972, and No. 83 came similarly on February 4, 1972. The evidence does not indicate that at those times the bank had any information Myler's grain supply was depleted as compared to outstanding warehouse receipts. Subsequently receipts 78 and 83 were properly applied by the bank as collateral for other notes, and at the time Myler closed his doors in the fall of 1972 they constituted collateral for a note of $11,640 dated June 26, 1972, one of the three notes the bank now holds.

Between the issuance of Nos. 78 and 83 and issuance of later receipts now held by the bank, relevant events occurred. Following issuance of Nos. 78 and 83, the bank requested additional receipts as collateral for other notes, but the receipts were not forthcoming. The fact was that Myler did not have grain on which to issue receipts. In addition, someone acting for the bank lent Myler $25,000 at one point without getting receipts for collateral.

A conversation then occurred which constitutes the crux of the case as to the remaining warehouse receipts, Nos. 95 through 117. Richard M. Coe was executive vice president of the bank and actually ran it. Janice Tooley was Myler's bookkeeper and actually ran the internal business affairs at the elevator. Tooley took some clothing into an Avoca laundromat, and Coe went there and conversed with her. These two witnesses disagree as to the date and substance of the conversation. Tooley testified:

Q. (Merchants' attorney) Okay. Then would you explain what took place in the laundromat or what happened? A. Well, he came in and he wanted to know—or he wondered how come we hadn't gotten these warehouse receipts up there yet. And he wanted to—he said that there had better be enough grain to take care of them and I told him there wouldn't be.

Q. Who first started talking about— well, first of all, what was your answer to his statement? A. That there wouldn't be enough grain?

Q. Yes. A. I just told him there wouldn't be.

Q. There wouldn't be enough grain? A. To take care of them. . . .

Q. And how was it that you happened to tell him that there was a shortage? A. Just by his asking me. . . .

Q. (Bank's attorney) Mrs. Tooley, when you and Mr. Myler's son, Jim, took the warehouse receipts No. 95 through 117 down and delivered them to Mr. Coe at the bank, you didn't tell him at that time that there was no grain to cover or the warehouse receipts were false or anything of that nature, did you? A. Well, no, I didn't, because he knew it already then.

Coe, however, associated the conversation with a warehouse receipt as collateral for a loan of $8000. The Commerce Commission disapproved the warehouse receipt because the grain was stored in an unbonded quon-

set. Coe testified regarding the laundromat conversation:

Q. (Bank's attorney) And then what happened? A. Well, I went in and asked her what was the trouble and she said that they had a warehouse receipt there that was under—that was in the quonset hut down there and they had to have it back to pay off so that their bonded warehouse receipts would be okay, and then she said, "But there isn't any grain out in the quonset." And I said, "Well, that doesn't sound right, but all I have to do is call the Commerce Commission to find out exactly what there is," but I said, "I'm going to get ahold of Myler. You have him up here in the morning." According to my records, he was in there on the 18th. I took a new financial statement which was dated February the 18th on which he stated that he had warehouse grains stored in the warehouse on which it was bonded, total value of warehouse grains of $76,000.00, and that he had grain down in the warehouse or the quonset valued at $98,356.00. And I said to him at the time, I said, "Red, your girl says you don't have any grain down there." He said, "Well, she don't really know what's going on only half of the time."

(The trial court on motion struck the last remark.)

Coe testified further:

Q. (Merchants' attorney) Okay. Now specifically speaking, the matter of the conversation in the laundromat, what records are you referring to as to that? A. That's no record as far as I am concerned. It's just my memory of the happenings when I discovered that there was a twenty-five thousand dollar loan without warehouse receipts and Janice said there wasn't any grain to cover it. I immediately started getting a new financial statement to find out if that was true. And when I had been assured by Mr. Myler by his financial statement, I assumed that there was some error.

Subsequent to the laundromat conversation, Myler issued warehouse receipts Nos. 94, 95 through 104, and 105 through 117. No grain existed for issuance of these receipts. Tooley, who customarily signed receipts, signed No. 94 but refused to sign the rest. Myler did so. He pledged them all to the bank. Receipt 94 became the alleged collateral for notes. Subsequently the bank applied that receipt as collateral for a note for $5100 dated August 14, 1972, which the bank now holds—the second of the bank's present three notes. Receipts 95 through 117 became the alleged collateral for the previously unsecured note of $25,000 and a note for $19,200. Subsequently those receipts were applied by the bank as collateral for a note of $44,200 dated August 15, 1972—the third of the notes the bank now holds. The principal of the three unpaid notes thus amounts to $60,940.

Myler continued to render required monthly reports to the Commerce Commission as to his grain in the elevator. Tooley, at Myler's insistance, falsified those reports to show much larger quantities of grain than existed.

This condition of affairs went on for several months, with Myler doing business with farmers, terminals, and the bank. But he did not pull out of his bad condition and a very substantial shortage of grain existed. By September 1972, Myler simply could not pay grain sellers in the course of business. About September 14, 1972, the bank called in the Commerce Commission to investigate the situation. The Commission discovered the shortage, and Myler had to close his doors.

Thereafter the bank instituted insolvency proceedings against Myler which are not relevant to this case.

The bank then commenced the present action against Merchants on its bond, as did other claimants. The basis of the bank's claim is that Myler violated his duties as warehouseman with respect to the warehouse receipts the bank holds by issuing the receipts upon nonexistent grain. Merchants denied liability and the parties tried the case to a jury. The jury found for the bank in the amount of the bond, the trial court entered judgment accordingly, and

Merchants appealed. Myler's undisputed liability is not involved in the appeal.

The Code of 1971 was in effect at the time of the events here, and unless otherwise stated our references are to that Code.

An elevator operator ordinarily occupies one or the other of two basic roles: a buyer or seller of grain, that is, a grain *dealer,* or a storer of grain, that is, a *warehouseman.* In either role he can work considerable financial harm upon the public, and the legislature has endeavored to provide the public a measure of protection. In recently-enacted chapter 542 of the Code of 1975, the legislature has imposed a requirement that with certain exceptions anyone who engages in the business of buying grain for resale must obtain a license and post a bond "conditioned that the applicant will pay the purchase price of any grain to the seller, and that the grain dealer owns, free of liens, any grain which he offers for sale . . .." § 542.4, Code 1975. In earlier-enacted chapter 543 of the Code, which is involved here, the legislature has regulated grain storage in both unlicensed warehouses and in licensed ones such as Myler's elevator. A licensed warehouseman must post a bond in order "to secure the faithful performance of his obligations as a warehouseman under the terms of this chapter and the rules and regulations prescribed hereunder, and of such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agricultural products in such warehouse." § 543.12, Code 1971. A licensed warehouseman may issue warehouse receipts on grain stored in his facility, § 543.18, including his own grain. § 543.20. When he issues warehouse receipts on grain which he himself owns, he may dispose of the title to or an interest in such grain through the medium of the warehouse receipts the same as a third person could do who deposited grain and obtained warehouse receipts. § 543.20.

The evidence presented by the parties leaves no doubt about the facts here, with one major exception. On most issues the rule applies which this court stated in *Bak-*

*er v. General American L. Ins. Co.,* 222 Iowa 184, 188, 268 N.W. 556, 558:

> But when the evidence all points in one direction, is not in material conflict on the issues involved, and there are no circumstances which tend to impair or impeach the same, and is not susceptible of inherent weakness, improbabilities, and incongruities, which in and of themselves, naturally arise to contradict or impeach the weight and credibility of the utterances of the witnesses, then it can most certainly be said as a matter of law that the record presents a case about which the minds of reasonable men cannot differ, and the court is, under such circumstances, warranted in directing a verdict, and there is no sound principle standing in the way of such action on the part of the court.

The appeal may be considered in two principal parts. One part relates to issues established as a matter of law or governed by a specific rule of law. The other part relates to the issue which involves a fact question.

I. As to the first part of the appeal, Merchants assigns a number of errors of law.

(a) Merchants begins by arguing that the district court erred in overruling its motions to consolidate and to dismiss based on the ground that two other claimants sued on the bond and the claims aggregate more than the face of the bond. The other claimants are William True and Harry Michael. Merchants states that those claimants are indispensable parties to this case under rule 25(b), Rules of Civil Procedure. The district court held the motion to consolidate premature and the other claimants not to be indispensable.

We find no necessity to say whether the court was right or wrong in its ruling on the motions, in view of the posture of the three claims. We hold today in the *True* case that Merchants is not liable to True. Hence True's claim may be placed aside. In the *Michael* case we hold that Merchants may or may not be liable, depending on further findings by the trial court. If the

trial court finds against Michael, only the bank's claim will remain, which is only for the amount of Merchants' bond. If however the trial court finds for Michael, the bank and Michael claims will total more than the amount of the bond.

[1] Neither the bank nor Michael contend, however, that Merchants can be held for more than the amount of its bond. Indeed, the district court held Merchants' motions premature because the parties conceded that Merchants' total liability was limited to the amount of its bond and contended that the matter of sorting out the amount each claimant should have from the bond fund should come later. The district court having on that basis required Merchants to go to trial separately on the three claims, Merchants should have the right to avail itself of further proceedings in district court should the bank and Michael, together or separately, try to hold it for more than the amount of its bond; and we so hold. We find no basis for reversal at this point.

(b) In ruling on the motion to dismiss based on absence of indispensible parties, the district court stated that the bank could not bring itself within the parameters of Merchants' bond. Merchants argues that this statement became the law of the case so that the district court could not hold otherwise at the trial.

■ Even if the statement in the ruling on the motion to dismiss became the law of the case as to the district court, it would not bind us on appeal. Rules 110, 331(b), R.C.P. Moreover, except for adjudications under rule 105, district court rulings in a case ordinarily do not prevent that court, either through the same or another judge, from ruling otherwise in the later progress of the case. The "law of the case" arises only after a ruling becomes final. *Richman v. Board of Supervisors of Muscatine County,* 77 Iowa 513, 524, 42 N.W. 422, 426 ("We are not prepared to hold that if, during the trial of the issues of an action a court becomes convinced of an error he may not correct it. It would be a serious impediment to a fair and speedy disposition of causes if such a rule was to obtain.");

*Whitfield v. Grimes,* 229 Iowa 309, 294 N.W. 346.

We find no error here.

(c) Merchants next contends the trial court should have ruled for it as a matter of law because the bank did not introduce substantial evidence that free grain existed in the warehouse on which Myler could issue receipts to himself for transfer to the bank.

This contention raises a fundamental issue as to the coverage of a warehouseman's bond under chapter 543 of the Code. Merchants appears to hold the view that bonds cover only conversion of existing grain, as when a farmer deposits grain in an elevator, the operator issues a warehouse receipt, and later the operator disposes of the grain without permission of the holder of the receipt.

■ We are not willing to isolate the coverage of warehouse bonds to the conversion-type situation. The statutory condition of a warehouseman's bond under chapter 543 is "faithful performance of his obligations as a warehouseman under the terms of this chapter" (and under rules imposed and obligations assumed). § 543.12. One of the several obligations of a licensed warehouseman under chapter 543 is issuance of warehouse receipts. § 543.18. That section refers to § 554.7203 of the Uniform Commercial Code, which renders the issuer of a warehouse receipt liable for nonreceipt of the goods. From this we hold that if a warehouseman issues a warehouse receipt for grain which he does not have, he breaches his duty of faithful performance as warehouseman, and his bond covers. See I.C.C. Rule 12.15(543), 1971 I.D.R. 127. The Supreme Court of Georgia dealt with this situation in *Maryland Cas. Co. v. Washington Loan & Banking Co.,* 167 Ga. 354, 365, 145 S.E. 761, 766:

An obligation rests upon a warehouse company not to issue receipts for goods in which it recites that it owns such goods, and that it will deliver the same to the holder of such receipts, when in fact such goods are not in existence or are not

stored with it. The purpose of the bond is to protect persons dealing with the warehouseman, in the usual and customary method of business, and against fraudulent and unlawful acts of the warehouseman in issuing receipts for goods in which it recites their storage, when the recital is false. For a breach of this obligation the surety upon its bond becomes liable to the pledgee of the receipts for the falsity of such statement.

■ Merchants' bond thus covers whether Myler had or did not have the grain on which he issued receipts that he pledged to the bank. If he had the grain and disposed of it without the receipts, the bond covers. If he did not have the grain and issued the receipts and pledged them to the bank without notice, the bond covers. *National Bank of Wilkes v. Maryland Cas. Co.,* 167 Ga. 737, 146 S.E. 739; Bascom, Articles Seven and Nine of the Uniform Commercial Code—Security Interest in Warehouseman's Own Receipts Covering Fungibles, 1969 Wash.U. L.Q. 105, 120; 78 Am.Jur.2d Warehouses § 95 at 239; 93 C.J.S. Warehousemen & Safe Depositaries § 28 at 442.

We find no error at this point.

(d) Another contention by Merchants is that the bank did not prove a formal demand upon the warehouseman for the grain supposedly stored under the receipts.

■ The record establishes beyond any question that when Myler closed his doors, no grain existed to fulfill these receipts. The law does not require a useless act. *State v. Farmers Elevator Co.,* 59 N.D. 679, 686, 231 N.W. 725, 727 ("demand was not necessary, for the reason that the defendant elevator company was at no time after the closing of the elevator in October in a position to comply therewith, and therefore a demand would have been unavailing"); 8 Am.Jur.2d Bailments § 113 at 1010; 93 C.J.S. Warehousemen & Safe Depositaries § 51 at 478. The trial court did not err on this issue.

■ (e) Merchants next relies on § 554.-7503(1) of the Uniform Commercial Code. The substance of that provision so far as now relevant is that a warehouse receipt confers no right in goods against a person who before issuance of the document had a perfected security interest in the goods. Merchants argues that the bank had a perfected security interest in Myler's free grain; hence under the wording of § 554.-7503(1), the warehouse receipts conferred no right.

Obviously however § 554.7503(1) contemplates a situation in which a *third* party holds the perfected security interest. E.g. *Cleveland v. McNabb,* 312 F.Supp. 155 (W.D.Tenn.) (contest between third-party landlord holding lien and holder of receipt).

No error appears.

(f) Next Merchants contends its bond does not cover because the bank did not show that Myler stored "for compensation" or that the bank or its transferor deposited grain.

■ Under section 543.12, the bond covers obligations of the principal as a "warehouseman." Section 543.1(8), as it read at the time of these events, defined a warehouseman as one who uses a warehouse to store agricultural products "for compensation." Myler had a license to operate a warehouse under chapter 543. Section 543.-28 required that a warehouseman establish rates, and Myler did so; the Commission could not have permitted him to operate at all if he had not done so. Moreover, the same section established minimum rates, below which Myler could not have gone. Indeed the very warehouse receipts in suit state that Myler claimed a lien for charges of storage, delivery, and conditioning. Under the law and the facts, a finding that Myler did not use his warehouse to store "for compensation" could not stand.

■ Merchants' insistence that only actual depositors of grain and their transferees come under its bond flies in the face of § 543.20, which permits a warehouseman to issue receipts on his own grain and to dispose of the receipts as a third-party depositor of grain might do. Merchants' assertion that § 543.20 can only be used as a basis of liability of a surety when the warehouse-

man issues receipts on his grain actually on hand misconceives the purpose of the bond requirement to protect the public against the unworthy warehouseman who has statutory authority to issue receipts on his grain but abuses that authority by issuing receipts on grain which he purportedly has but in fact does not have.

We do not find merit in this assigned error.

(g) Merchants assigns error in the failure of the trial court properly to submit the damage issue to the jury. Section 543.14 authorizes a person injured by breach of any obligation of a warehouseman to recover "any damages he may have sustained by reason of such breach." The damages here could not exceed the least of three items: the amount of the bond, the sum of the three notes, or the value of the pledged grain.

The amount of the bond is $52,000, and the sum of° the three notes is $60,940.

■ As to the value of the pledged grain, the value to be taken is the highest price between the time of the wrong and commencement of suit. *United States v. Merchants Mut. Bonding Co.*, 242 F.Supp. 465 (N.D.Iowa). According to the notes and warehouse receipts themselves, Myler pledged to the bank 1700 bushels of beans worth $5100 and 58,000 bushels of corn worth $55,800 (other evidence showed corn to be worth considerably more), for a total of $60,900. Under the record, a finding that the beans and corn were worth less than $52,000 could not stand.

■ The trial court did not instruct the jurors on the measure of damages, but did tell them that they could not find for more than $52,000. They found for the bank in that amount. The trial court should have instructed the jury that they should return a verdict for $52,000 or nothing. It was error for the court to instruct the jury that they could return a verdict for not more than $52,000; this permitted them to find for some lesser amount if they found for plaintiff. Since however the jury returned a verdict for $52,000, no reversible error

resulted. We therefore do not sustain this assigned error.

■ (h) Finally on this part of the case, Merchants contends the trial court erred in failing to caution the jury that Merchants was not an insurer, guarantor, or surety on Myler's notes to the bank. The trial court narrowed the case to one major issue, as we will relate, and focused the jurors' attention on that issue. The instructions given made clear what the jury had to decide. We are unable to see the necessity for instructing on unrelated issues and introducing confusion into the submission. A trial court has some discretion in the area of cautionary instructions, and we find no abuse here. *Lolkus v. Vander Wilt,* 258 Iowa 1074, 141 N.W.2d 600. The court did not err.

II. As to the second part of the appeal, the crux of the case is factual: whether the bank knew that insufficient grain existed to cover the warehouse receipts but nevertheless took them as ostensible security. We are not dealing here with the usual situation in which the holder of title documents is seeking to uphold the documents and cut off equities or claims of the issuer or of third persons. See § 554.7502, U.C.C. We are dealing with a bank which not only admits but asserts that the warehouse receipts in its possession are invalid, and claims that the wrongdoer's bondsman must therefore pay. The bank claims nothing under the documents themselves but turns to the surety as the one who stands behind the wrongdoing issuer of invalid documents. Without additional facts which negate liability, the bank comes within the coverage of the bond and can recover. 78 Am.Jur.2d Warehouses § 136 at 268–269.

■ At this point however we have the interjection of an additional alleged fact: knowledge by the bank of the invalidity of the title documents when the bank received them. As a matter of common law, what effect does this have upon the right of the bank to hold the bondsman? The Georgia Supreme Court dealt with this issue, and laid down what we deem to be the sound

rule, in *National Bank of Wilkes v. Maryland Cas. Co.*, 167 Ga. 737, 757–758, 146 S.E. 739, 749:

> Furthermore, if the transaction was a mere scheme by which the warehouse company undertook to obtain from the bank funds for its own use, by pledging cotton which it did not own or on which it had no lien for advances made to depositors of such cotton, and which the parties to whom the receipts were issued did not own, or in which they did not have any interest, it was not a genuine warehouse transaction, and if the bank knew the character of the transaction at the time it discounted the notes secured by the warehouse receipts, the surety on the bond of the warehouse company would not be liable to the bank on the receipts so issued and used.

Merchants and the bank strenuously disagree about the evidence regarding the bank's knowledge that Myler had insufficient grain to issue the warehouse receipts. Merchants contends the evidence shows as a matter of law the bank knew from Coe's laundromat conversation with Tooley that Myler did not have sufficient grain, but the bank was in so deeply with Myler that it played along with him hoping his situation would improve. Merchants says that when Myler did not pull out of his trouble by the fall of 1972, the bank called in the Commerce Commission and closed him up. Merchants asserts that the bank could not thus bootstrap itself into protection under the bond when it never was fooled by the receipts but knew the truth about them all along.

The bank contends the contrary, that under the evidence the bank's knowledge or lack of knowledge from the Coe-Tooley conversation was a question of fact for the jury, which decided the question in the bank's favor.

█ Our examination of the evidence discloses that no question of fact existed as to receipts 78 and 83. They were issued some time before the conversation in question and nothing indicates the bank knew they were infirm. As to the rest of the receipts, we believe the trial court was right in submitting to the jury the issue of the bank's knowledge. The issue is close, as Merchants made a strong showing on the facts that the bank made a bad unsecured loan of $25,000 and endeavored to bail itself out by taking warehouse receipts knowing Myler had insufficient grain, trying to get under the umbrella of Merchants' bond. But under all the evidence we hold the issue of the bank's knowledge was for the trier of fact.

█ Merchants also urges in this connection that the trial court's instructions did not adequately place before the jury the issue of the bank's knowledge. We have examined the instructions. They appear to us to present the matter fairly to the jury. Under the rule of the *Wilkes* decision by the Georgia Supreme Court, the question was whether the bank through Coe knew that Myler did not own grain on which he purported to issue the receipts. The trial court laid this question before the jury. The court was not required to use the wording in Merchants' requested instructions in submitting the questions. *State v. Tensley*, 249 N.W.2d 659 (Iowa).

Since we find no reversible error here or on the trial court's other rulings, we uphold the judgment.

AFFIRMED.

All Justices concur except REES, J., who takes no part.