Tom **FITZGERALD**, Appellant,

v.

**SALSBURY CHEMICAL, INC.**
and **Cambrex Corporation**,
Appellees

No. 98–1492.

Supreme Court of Iowa.

July 6, 2000.

Pamela J. Prager of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellant.

Frank Harty and Thomas W. Foley of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., for appellees.

CADY, Justice.

In this appeal, we must decide whether a former employee presented a prima facie cause of action for wrongful termination in violation of public policy. The action was premised on the dual claim that the employee was discharged because he did not support his employer's decision to terminate another employee and the employer feared he intended to testify on behalf of the other employee in a potential lawsuit. We reverse the order entered by the district court granting summary judgment for the employer and remand the case for further proceedings.

## I. Background Facts and Proceedings.

Tom Fitzgerald was employed by Salsbury Chemical, Inc. at its production plant in Charles City. Salsbury manufactures chemicals and pharmaceutical bulk actives. Fitzgerald was employed as a production foreman at the plant.

Fitzgerald was terminated from his employment with Salsbury on September 19, 1995. The termination followed an incident on August 30, 1995, involving a production worker named Richard Koresh. Koresh failed to properly monitor the

temperature and pressure of a tank used to mix a chemical compound. His conduct created a potentially dangerous condition.

Koresh was suspended from his employment on September 4, 1995, after Salsbury conducted a preliminary investigation into the incident. He was ultimately terminated on September 19, 1995, a few hours prior to the time Fitzgerald was terminated. Fitzgerald was responsible for supervising Koresh on the date of the incident.

Salsbury asserted Fitzgerald was terminated for failing to properly supervise Koresh and to prevent the potentially dangerous incident. Fitzgerald, however, believed he was discharged because he did not support Salsbury's decision to discharge Koresh and Salsbury officials feared he would provide testimony in support of Koresh in the course of threatened legal action by Koresh.

The events supporting this claim extend back to August 15, 1995, when Koresh gave deposition testimony in a wrongful discharge action against Salsbury by a former employee named John Kelly. Kelly was terminated several years earlier, one day prior to his scheduled deposition in a wrongful death action against Salsbury by the estate of a former employee. The former employee died after a chemical compound he was mixing at the plant overheated and exploded. Salsbury claimed Kelly was terminated because his unsafe conduct caused the explosion. Kelly claimed he was terminated by Salsbury in an effort to cover up its culpability in the incident. During the deposition on August 15, 1995, Koresh contradicted earlier deposition testimony by two Salsbury management officials concerning the internal investigation of the work practices of Kelly. Koresh also testified he believed Kelly was a safe operator. Following the deposition, Koresh felt shunned by Salsbury management. He was also told by a foreman the company was going to find a way to fire him. After Koresh was suspended on September 4, 1995, he told a Salsbury official

that he had hired an attorney and was "not going to be another John Kelly."

Fitzgerald engaged in a conversation with the plant operations manager on September 19, 1995, a few hours prior to the time he was told of his termination. The manager asked Fitzgerald what discipline he believed should result to Koresh because of the incident on August 30. Fitzgerald responded he did not believe it was fair to fire Koresh over a single mistake. Fitzgerald also indicated he did not believe Koresh should be fired in light of his long years of service to the company. The manager then informed Fitzgerald he needed to begin to think like a foreman if he was going to be one, and he needed to find out which side he was on. Fitzgerald was also informed the matter may result in a lawsuit. Fitzgerald does not claim he responded to the statements.

Fitzgerald instituted this wrongful discharge action against Salsbury. He alleged his termination violated a public policy of this state to protect workers who oppose the unlawful termination of a co-worker. Additionally, he claimed he was terminated because he intended to provide testimony in Koresh's future wrongful termination lawsuit that would be unfavorable to Salsbury and the company wanted to discredit his potential testimony as a disgruntled former employee. Fitzgerald claims Salsbury's motivation to terminate him violated the public policy of this state to provide truthful testimony in court proceedings.

The trial court dismissed the action following a hearing on the motion for summary judgment. It found no public policy of this state was implicated by the two factual claims urged by Fitzgerald. Although the trial court found the criminal statutes against committing and suborning perjury established a public policy prohibiting such conduct, it found no facts to show the criminal statutes had been violated by Salsbury.

## II. Scope of Review.

Our review of a summary judgment ruling is for corrections of errors of law. Iowa R.App. P. 4; *Kennedy v. Zimmermann*, 601 N.W.2d 61, 63 (Iowa 1999). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 237(c). Summary judgment is properly granted where the only controversy is the legal effect of the undisputed facts. *Krause v. Krause*, 589 N.W.2d 721, 724 (Iowa 1999). When the facts are not in dispute, we will simply decide whether the district court correctly applied the law to the undisputed facts before us. *Iowa Tel. Ass'n v. City of Hawarden*, 589 N.W.2d 245, 250 (Iowa 1999).

## III. The Employer–Employee Relationship.

### A. Employment At–Will.

 Absent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will. *See Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 281 (Iowa 1995). This means the employment relationship is terminable by either party "at any time, for any reason, or no reason at all." *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997). The roots of the at-will employment doctrine are more than a century old. It is said to have originated in an 1877 treatise by Horace Gray Wood, which articulated the rule in clear and appealing terms:

> With us, the rule is inflexible, that a general or indefinite hiring is, *prima facie*, a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof.... [I]t is an indefinite hiring and is determinable at the will of either party.

Horace G. Wood, *A Treatise on the Law of Master & Servant* § 134, at 272 (1877). Despite its direct contradiction to the traditional English rule, the at-will rule was judicially adopted in New York, see *Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 42 N.E. 416, 417 (1895), and quickly became the prevailing rule throughout the country.[1] The United States Supreme Court gave the doctrine a boost in 1908 in *Adair v. United States*, when it found a federal law making it a crime to discharge an employee for being a member of a union violated due process guarantees of freedom of contract. *Adair v. United States*, 208 U.S. 161, 174–75, 28 S.Ct. 277, 280, 52 L.Ed. 436, 442 (1908) ("the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of the employee").

We too have long recognized that "indefinite employment may be abandoned at

---

1. As early as 1562, the English common law presumed employment was for a one-year term. *See* Gary E. Murg & Clifford Scharman, *Employment at Will: Do the Exceptions Overwhelm the Rule?*, 23 B.C.L.Rev. 329, 332 (1982) [hereinafter Murg & Scharman]. This was for the protection of the seasonal worker, as the presumption was difficult to overcome. *Id*. English courts held an employer liable for a breach of the employment contract for terminations prior to the expiration of the one-year term absent proof of a "reasonable cause to do so." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1030 (1985) (citing 1 W. Blackstone, *Commentaries* *413). Initially American courts adopted this English rule; however with the Industrial Revolution came the rise of a more impersonal employer-employee relationship and so went the traditional master-servant relationship and the protections that came with it. Murg & Scharman, 23 B.C.L.Rev. at 334.

The *Martin* court, and those which followed, adopted the at-will doctrine advocated by Woods without a thorough analysis of the underlying authority. Legal scholars have since criticized the basis for the rule. *See* Christopher L. Pennington, *The Public Policy Exception to the Employment–At–Will Doctrine: Its Inconsistencies in Application*, 68 Tul. L.Rev. 1583, 1586 n. 13 (1994) [hereinafter Pennington] (the four American cases Woods cited in support of his rule were far off the mark, no policy grounds were offered).

will by either party without incurring any liability." *Harrod v. Wineman,* 146 Iowa 718, 719, 125 N.W. 812, 813 (1910). Yet, the passage of time has begun to weaken this once powerful rule. The at-will employment doctrine first began to give way in 1937 when the United States Supreme Court abandoned the *Adair* holding and upheld the National Labor Relations Act which made it an unfair labor practice for an employer to consider membership in a union as a basis for hiring an employee. *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 916 (1937). After this case, courts began to scrutinize the common law doctrine, and the erosion began. *See* Pennington, 68 Tul. L.Rev. at 1589–90. As one court put it,

> [t]he at will presumption, the citadel that once governed the field with such predictability, has been eroded of late by piecemeal attacks on both the contract and tort fronts and the entire field seems precariously perched on the brink of change.

*Scott v. Extracorporeal Inc.,* 376 Pa.Super. 90, 545 A.2d 334, 336 (1988) (quoting *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 511 A.2d 830, 834 (1986)).

In recent years three exceptions to the at-will employment doctrine have surfaced to add employee protections to the employer/employee relationship. Generally, these exceptions fall into three categories: (1) discharges in violation of public policy, (2) discharges in violation of employee handbooks which constitute a unilateral contract, and (3) discharges in violation of a covenant of good faith and fair dealing. *See Anderson,* 540 N.W.2d at 282 (citing Stephen F. Befort, *Employee Handbooks & the Legal Effect of Disclaimers,* 13 Indus. Rel. L.J. 326, 333–34 (1991/1992)).

■ We have only adopted the first two recognized exceptions to the doctrine. *See Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978) (we first recognized the possibility of public policy exception); *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560 (Iowa 1988) (narrow public policy exception adopted); *French v. Foods, Inc.,* 495 N.W.2d 768, 769–71 (Iowa 1993) (employee handbook may create unilateral contract). We have consistently refused to adopt a covenant of good faith and fair dealing with respect to at-will employment relationships. *See Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 220 (Iowa 1996). Thus, the traditional doctrine of termination "at any time, for any reason, or no reason at all," *Phipps,* 558 N.W.2d at 202, is now more properly stated as permitting "termination at any time for any *lawful* reason." *Lockhart v. Cedar Rapids Community Sch. Dist.,* 577 N.W.2d 845, 846 (Iowa 1998).

## B. The Public Policy Exception.

■ We have identified the elements of an action to recover damages for discharge in violation of public policy to require the employee to establish (1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge. *Teachout v. Forest City Community Sch. Dist.,* 584 N.W.2d 296, 299 (Iowa 1998).

■ These elements properly identify the tort of wrongful discharge when a protected activity has been recognized through the existence of an underlying public policy which is undermined when an employee is discharged from employment for engaging in the activity. *See Tullis v. Merrill,* 584 N.W.2d 236, 239 (Iowa 1998) (public policy in favor of permitting employees to make demand for wages due gives rise to an action for wrongful discharge for making a demand for wages); *Teachout,* 584 N.W.2d at 299 (public policy of this state in favor of reporting suspected child abuse gives rise to an action for wrongful discharge for reporting or intending to report child abuse); *Lara v. Thomas,* 512 N.W.2d 777, 782 (Iowa 1994) (public policy of this state in favor of permitting employees to seek unemployment compensation gives rise to an action for

wrongful discharge for seeking partial unemployment benefits); *Springer*, 429 N.W.2d at 560 (public policy of this state in favor of permitting employees to seek workers' compensation for work-related injuries gives rise to an action for wrongful discharge for asserting a right to workers' compensation benefits). However, when we have not previously identified a particular public policy to support an action, the employee must first identify a clear public policy which would be adversely impacted if dismissal resulted from the conduct engaged in by the employee.[2] *See Yockey v. State*, 540 N.W.2d 418, 420–21 (Iowa 1995) (the public policy in favor of permitting employees to seek workers' compensation benefits not jeopardized by termination from employment for missing work following injury); *Borschel v. City of Perry*, 512 N.W.2d 565, 567 (Iowa 1994) (no public policy in favor of presumption of innocence in work place to give rise to an action for wrongful discharge for conduct which resulted in criminal charges); *French*, 495 N.W.2d at 771–72 (presumption of innocence not an actual public policy).

It is generally recognized that the existence of a public policy, as well as the issue whether that policy is undermined by a discharge from employment, presents questions of law for the court to resolve. 2 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 7.9, at 18 (4th ed.1998) [hereinafter Perritt]; Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 5:22, at 69 (1995) [hereinafter

Tobias]; *Roberts v. Dudley*, 140 Wash.2d 58, 993 P.2d 901, 905 (2000) (existence of public policy is a question of law). Thus, these questions are generally capable of resolution by a motion for summary judgment. On the other hand, the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact. Tobias § 5:22, at 69–70. Notwithstanding, to withstand summary judgment a plaintiff must not only satisfy the court on the public policy and jeopardy elements of the tort, but offer adequate evidence from which a lack of justification for termination can be inferred. Perrit § 7.9, at 18.

## 1. Determining Public Policy.

In first recognizing the public policy exception to the at-will employment doctrine, we were careful to limit the tort action for wrongful discharge to cases involving only a well-recognized and clear public policy. *Springer*, 429 N.W.2d at 560. This requirement has been incorporated in our subsequent cases. This important element sets the foundation for the tort and it is necessary to overcome the employer's interest in operating its business in the manner it sees fit. Perrit § 7.10, at 19. It also helps ensure that employers have notice that their dismissal decisions will give rise to liability. *Stevenson v. Superior Ct.*, 16 Cal.4th 880, 66 Cal.Rptr.2d 888, 941 P.2d 1157, 1161 (1997).

---

2. Some courts are beginning to articulate the elements of a cause of action for wrongful discharge as:
 1. The existence of a clear public policy (the clarity element).
 2. Dismissal of employee under circumstances alleged in the case would jeopardize public policy (the jeopardy element).
 3. The plaintiff engaged in public policy conduct and this conduct was the reason for the dismissal (the causation element).
 4. Employer lacked an overriding business justification for the dismissal (the absence of justification element).
*Gardner v. Loomis Armoured, Inc.*, 128 Wash.2d 931, 913 P.2d 377, 382 (1996); *Col-*

*lins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653, 657 (1995).
 This approach is derived from the methodology proposed by Dean and Law Professor Henry H. Perrit, Jr. *See generally* Henry H. Perrit, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self-Interest Lie?*, 58 U. Cin. L.Rev. 397–430 (1989). This four part structure of proof is now detailed in Professor Perrit's multi-volume treatise on the subject. *See* Perritt § 7.9, at 18. This is a helpful guide and actually parallels the approach we have followed in addressing the tort on a case-by-case method.

In determining whether a clear, well-recognized public policy exists for purposes of a cause of action, we have primarily looked to our statutes but have also indicated our Constitution to be an additional source. *Borschel,* 512 N.W.2d at 567. We have not been asked to extend our sources of public policy beyond our statutes and Constitution, but recognize other states have used additional sources such as judicial decisions and administrative rules. *See generally* Tobias § 5:05–:06, at 16–23.

■ Some statutes articulate public policy by specifically prohibiting employers from discharging employees for engaging in certain conduct or other circumstances.[3] Yet, we do not limit the public policy exception to specific statutes which mandate protection for employees. *Teachout,* 584 N.W.2d at 300. Instead, we look to other statutes which not only define clear public policy but imply a prohibition against termination from employment to avoid undermining that policy. *See Borschel,* 512 N.W.2d at 568.

■ Our insistence on using only clear and well-recognized public policy to serve as the basis for the wrongful discharge tort emphasizes our continuing general adherence to the at-will employment doctrine and the need to carefully balance the competing interests of the employee, employer, and society. *See Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989) (common law doctrine of employment at-will is firmly rooted in Iowa law); 82 Am.Jur.2d *Wrongful Discharge* § 15,

at 687–88 (1992) (purpose of public policy exception is to balance competing interests of society, employers, and employees in light of the modern business experience). An employer's right to terminate an employee at any time only gives way under the wrongful discharge tort when the reason for the discharge offends clear public policy. *See Lockhart,* 577 N.W.2d at 846.

■ The need for clarity in public policy is similarly recognized in our reluctance to search too far beyond our legislative pronouncements and constitution to find public policy to support an action. Thus, we must proceed cautiously when asked to declare public policy to support an exception to the at-will doctrine, and only utilize those policies that are well recognized and clearly defined. *Burnham v. Karl & Gelb, P.C.,* 252 Conn. 153, 745 A.2d 178, 182 (2000) (public policy exception is narrow and courts should not lightly intervene to impair the exercise of managerial discretion). Any effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself. *See* Tobias § 5:05, at 17. Moreover, it could unwittingly transform the public policy exception into a "good faith and fair dealing" exception, a standard we have repeatedly rejected. *Id.; see Huegerich,* 547 N.W.2d at 220.

### 2. Determining Jeopardy to Public Policy.

■ Once a clear public policy is identified, the employee must further show

---

**3.** *See* Iowa Code §§ 29A.43 (1995) (absences for membership in military reserves protected); 49.109–.110 (absence for voting protected); 79.2 (employee may take medical leave of absence upon recommendation of physician without retaliation); 79.28 (no retaliation for whistleblower reporting of mismanagement of funds); 85.18 (workers' compensation rights protected); 88.9(3) (no retaliation for actions pursuant to the Occupational Safety and Health Act); 91A.10(5) (actions for wage and hour disputes are protected); 598.22 (employee cannot be terminated based upon child support withhold-

ings); 601A.11(2) (Iowa Civil Rights Act prohibits retaliation against those who oppose unlawful employment practices or participate in proceedings pursuant to the Act); 607A.45 (absence for jury duty is protected); 642.21 (garnishments for consumer credit transactions); 730.2–.4 (employee may not be blacklisted for terminating relationship, employer may not mislead former employee's potential employer with false statement, nor require successful polygraph test); 731.2 (employment may not be denied to employee based upon membership in labor union).

the dismissal for engaging in the conduct jeopardizes or undermines the public policy. *See Yockey,* 540 N.W.2d at 421 (dismissal for missing work following work injury did not jeopardize public policy favoring filing for workers' compensation benefits). Thus, this element requires the employee to show the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the public policy by discouraging the conduct. *See Teachout,* 584 N.W.2d at 303 (public policy to report suspected child abuse implicated when employee is terminated for good faith intent to report child abuse); *Lara,* 512 N.W.2d at 782 (permitting discharge for conduct which conforms to public policy would create a chilling effect on public policy by indirectly forcing employees to forego the conduct); *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 684–85 (Iowa 1990) (public policy for employees to file workers' compensation claim implicated when employee is terminated after receipt of workers' compensation benefits); *Niblo v. Parr Mfg.,* 445 N.W.2d 351, 353 (Iowa 1989) (public policy for employees to file workers' compensation claim is implicated when employee is terminated for threatening to file claim). In *Lara,* we said

> Employers cannot be permitted to intimidate employees into foregoing the benefits to which they are entitled in order to keep their jobs. To hold otherwise in this context would create a chilling effect by permitting an employer to indirectly force an employee to give up certain statutory rights.

*Lara,* 512 N.W.2d at 782. Thus, when the conduct of the employee furthers public policy or the threat of dismissal discourages the conduct, public policy is implicated.

■■■ On the other hand, if a public policy exists, but is not jeopardized by the discharge, the cause of action must fail. *See Yockey,* 540 N.W.2d at 421 (public policy favoring workers' compensation claim not frustrated if employer terminated employee for missing work due to the work-related injury). The conduct of the employee must be tied to the public policy, so that the dismissal will undermine the public policy; *French,* 495 N.W.2d at 771–72 (public policy against suborning perjury not implicated if employer terminates the employee after using coercive and high-handed tactics to obtain confession).

This element guarantees an employer's personnel management decisions will not be challenged unless the public policy is genuinely threatened. *Gardner,* 913 P.2d at 382. If a public policy exists, but is not jeopardized by the discharge, the cause of action must fail. *See French,* 495 N.W.2d at 771–72 (public policy against perjury not implicated if employer terminates employee after using coercive or high-handed tactics to obtain confession).

### 3. Claim of Public Policy to Oppose Wrongful Termination of Co-Employee.

■■■ Fitzgerald first claims there is a public policy in this state which protects an employee from discharge by an employer for opposing the wrongful termination of a co-employee. He claims this public policy in favor of opposing the unlawful termination of a co-employee is derived from the Iowa Civil Rights Act, as well as Title VII of the Civil Rights Act of 1964. *See* Iowa Code § 216.11; 42 U.S.C. § 2000e–3(a) (1994).

Fitzgerald acknowledges the state and federal civil rights acts prohibit an employer from discriminating against a person who opposes a discriminatory practice as defined by the legislation, and do not apply to employee conduct of opposing the termination of a co-employee for engaging in conduct associated with our judicial system. Nevertheless, he argues these statutes, as well as others, reveal a broad public policy for employees to oppose all unlawful employment practices including the termination of a co-employee which is

contrary to public policy.[4] Fitzgerald claims the termination of Koresh was contrary to public policy of this state to provide truthful testimony and he should be afforded the same protection as the law provides Koresh.

We are reluctant to infer a broad public policy from a statute which is limited in its scope to specific discriminatory practices. *See Bennett v. City of Redfield,* 446 N.W.2d 467, 474 (Iowa 1989) (discipline in discharge provisions of chapter 400 excluded cities with populations of 15,000 or less and did not express a general public policy in favor of progressive disciplinary procedures in termination for good cause). Instead, we continue to adhere to our guiding principle to only declare public policy which is clearly articulated by a statute or other appropriate source. *See Springer,* 429 N.W.2d at 560. The statutes identified by Fitzgerald clearly do not expressly protect his conduct and we find nothing which can be inferred from the language of the statutes to establish the broad public policy suggested. *See Yockey,* 540 N.W.2d at 421 (statute which creates public policy in favor of filing workers' compensation claims does not embrace employee absenteeism based on work-related injury). Public policy involves a careful balance of competing interests, and we will not interfere with an employer's interest in running its business as it sees fit unless a clear, well-recognized public policy exists. *Gardner,* 913 P.2d at 382.

We also observe Fitzgerald has failed to show how any public policy in favor of opposing the claimed unlawful termination of a co-employee would be jeopardized by his dismissal. Fitzgerald offered no evidence that he expressed opposition to the discharge of a co-worker because it was unlawful. Instead, Fitzgerald admits the only objection he voiced to his employer over the termination of Koresh was the length of his employment service and the lack of prior infractions. He offered no evidence he objected to the termination of Koresh for providing truthful deposition testimony. The conduct of Fitzgerald, therefore, did not promote the claimed public policy, and his actions were not necessary to enforce any public policy. Fitzgerald failed to tie his conduct with his claim of public policy. *See Yockey,* 540 N.W.2d at 421 (discharge for absenteeism following work-related injury does not match public policy against discharge for filing workers' compensation claim).

### 4. Claim of Public Policy to Provide Truthful Testimony in a Legal Proceeding.

We next address the claim by Fitzgerald that he was terminated because he intended to provide truthful testimony, adverse to his employer, in a threatened future lawsuit of a co-employee against Salsbury. Our first task is to decide whether a public policy exists in this state against discharge of an employee for giving or intending to give truthful testimony in a legal proceeding.

Before considering our statutes, we observe other jurisdictions have recognized a public policy against firing an employee for giving testimony in court proceedings. The case that broke the ground for this exception was *Petermann v. International Brotherhood of Teamsters,* 174 Cal.App.2d 184, 344 P.2d 25 (1959). In *Petermann,* the California Court of Appeals first recognized a cause of action for wrongful discharge when an employee was terminated for refusing to perjure himself at his em-

---

4. It is not necessary for us to specifically decide if the public policy to support the tort of wrongful discharge in Iowa can be derived from a federal statute. There is a split of authority among the states. *See, e.g., Faulkner v. United Technologies Corp.,* 240 Conn. 576, 693 A.2d 293, 297–98 (1997) (a federal law can be a source of public policy); *Griffin*

*v. Mullinix,* 947 P.2d 177, 179–80 (Okla.1997) (federal statute cannot serve as a basis for state public policy); *see also* Perritt § 7.13, at 31–32. The issue gives rise to a host of considerations, including potential federal preemption issues. *See* 1 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* §§ 2.39–.46, at 168–91 (4th ed.1998).

ployer's request. 344 P.2d at 27. The court found a clear public policy against perjury was reflected in those penal statutes making the commission and subornation of perjury unlawful. *Id.* The court stated:

> In order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury.... The public policy of this state as reflected in the penal code ... would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury.

*Id.*

This same reasoning has appealed to other courts when faced with actions by employees who were discharged either for refusing to perjure themselves or for testifying truthfully against their employers. *See Merkel v. Scovill, Inc.,* 570 F.Supp. 133, 140 (S.D.Ohio 1983), *overruled in part (on factual basis) by* 787 F.2d 174, 178 (6th Cir.1986) (employee fired for refusing to commit perjury); *see also Bishop v. Federal Intermediate Credit Bank,* 908 F.2d 658, 662 (10th Cir.1990) (employee fired after truthful testimony at a congressional hearing); *Freeman v. McKellar,* 795 F.Supp. 733, 742 (E.D.Pa.1992) (employee fired after truthful testimony before grand jury); *Montalvo v. Zamora,* 7 Cal.App.3d 69, 86 Cal.Rptr. 401, 404 (1970) (employees fired because employer believed they intended to testify in a minimum wage action); *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 110 (Colo.1992) (employee fired for refusing to misrepresent quality control deficiencies, an illegal act); *DeRose v. Putnam Management Corp.,* 398 Mass. 205, 496 N.E.2d 428, 431 (1986) (employee fired for failure to testify as employer wanted); *Williams v. Hillhaven Corp.,* 91 N.C.App. 35, 370 S.E.2d 423, 426 (1988) (employee fired for testifying at another employee's unemployment compensation hearing); *Ressler v. Humane Soc'y,* 480 N.W.2d 429, 431 (N.D.1992) (employee discharged for testifying truthfully).

■ Similarly, we find ample statutory support for a public policy in Iowa in favor of refusing to commit perjury. *See* Iowa Code §§ 720.2, .3, .4. Our statutes make it a crime to commit perjury, suborn perjury, or tamper with a witness. *Id.* Moreover, this public policy is not simply confined to the refusal to commit perjury but clearly embraces a broader public policy to provide truthful testimony in legal proceedings. *Page v. Columbia Natural Resources, Inc.,* 198 W.Va. 378, 480 S.E.2d 817, 825–26 (1996). A policy in favor of refusing to commit perjury necessarily implies an inverse corresponding public policy to provide truthful testimony. Additionally, the integrity of the judicial system, its fundamental ability to dispense justice, depends upon truthful testimony. This principle forms the basis for our perjury and related statutes. Furthermore, a reasonable employer should be aware that attempts to interfere with the process of obtaining truthful testimony, whether through intimidation or retaliation, is a violation of this public policy. *Id.; Stevenson,* 66 Cal.Rptr.2d 888, 941 P.2d at 1161. Thus, we conclude the public policy derived from our statutes against perjury and suborning perjury also supports a public policy to provide truthful testimony. We next consider whether this public policy is undermined when an employee is discharged from employment for engaging in the conduct claimed by Fitzgerald.

■ Salsbury first argues that discharging Fitzgerald cannot jeopardize public policy in favor of truthful testimony in legal proceedings because Fitzgerald never testified in a legal proceeding, was never requested to testify in a legal proceeding, and never expressed an intent to testify. Thus, Salsbury claims the conduct engaged in by Fitzgerald did not match the conduct protected by the public policy.

■ We agree a dismissed employee must engage in conduct related to public policy before the discharge can undermine that public policy. However, we view the good faith intent to engage in a protected activity the same as performing the protected activity. *Teachout,* 584 N.W.2d at 301. This is because employees would be discouraged from engaging in the public policy if they were discharged for their intent to engage in the public policy the same as if they actually engaged in the conduct. *See id.; Niblo,* 445 N.W.2d at 351 (public policy in favor of filing workers' compensation claim for work-related injuries was jeopardized by discharge for threat of filing). Thus, Fitzgerald must only show he had a good faith intent to truthfully testify.

■ An essential element of proof to establish the discharge undermines or jeopardizes the public policy necessarily involves a showing the dismissed employee engaged in conduct covered by the public policy. *See Barela v. C.R. England & Sons, Inc.,* 197 F.3d 1313, 1316 (10th Cir. 1999) (must show employee conduct brought public policy into play). Although proof the employee engaged in the conduct is also a part of the causation element of the tort, we must review Fitzgerald's conduct in this case to determine if it sufficiently matched the public policy of providing truthful testimony.[5]

Fitzgerald did not directly express an intention to testify truthfully in the lawsuit threatened by Koresh. Furthermore, he never told any company officials he possessed any particular damaging information about the threatened lawsuit. These facts suggest Fitzgerald did not contemplate testifying in a threatened lawsuit by Koresh prior to his discharge. Thus, we must review the summary judgment record to determine if a reasonable inference can be drawn that Fitzgerald maintained a good faith intent to testify truthfully in a lawsuit action prior to the discharge.

■ Courts are generally reluctant to rely on summary judgment to resolve cases when intent is a substantive element of the action. *Ness v. Marshall,* 660 F.2d 517, 519 (3rd Cir.1981). This is because inferences used to determine intent are fact-based. Thus, if two reasonable inferences can be drawn, summary judgment is inappropriate. An inference, however, must not be based on speculation or conjecture. *See Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3rd Cir.1990).

■ The conduct engaged in by Fitzgerald prior to his discharge amounted to internal opposition to the termination of a co-employee. Generally, mere internal opposition by an employee to the employer's decision to discharge a co-employee would not suggest an inference the employee intended to give truthful testimony in future litigation brought by the discharged co-employee. The internal expression of support for a co-employee under these circumstances is far removed from the external concepts of perjury and truthful testimony in court proceedings. However, there are additional facts which must be considered in our analysis at this stage of the proceedings.

This case is not simply about Fitzgerald expressing support for Koresh. Salsbury not only admonished Fitzgerald for failing to support his employer, but warned him that the matter could result in litigation and he must decide which side he would support. Thus, Salsbury placed Fitzgerald's support for Koresh in the context of litigation and transformed the conversation into choosing sides in a lawsuit. There was no evidence to suggest Fitzgerald backed down from his support for Koresh after the conversation turned to litigation. These facts permit a reasonable inference

---

**5.** No jeopardy can be shown if the plaintiff fails to match the conduct with the public policy. *See* Perritt § 7.17, at 46. Causation, however, also involves proof of conduct. With this element, the plaintiff must show the dismissal resulted from the protected conduct, and not for some other reason.

to be drawn that Fitzgerald, prior to his discharge, developed an intent to testify in threatened future litigation against his employer.

There are, of course, other inferences that could be drawn from the evidence. However, at this stage we are required to draw those reasonable inferences in favor of Fitzgerald as the nonmoving party to the summary judgment proceedings. In light of these inferences, we conclude that there is evidence to support the claim Fitzgerald engaged in policy-based conduct.

Nevertheless, Salsbury argues the jeopardy element of the tort cannot be satisfied as a matter of law because it never requested Fitzgerald to testify inconsistent with the public policy. Without a request to testify inconsistent with public policy, Salsbury asserts the discharge cannot undermine any public policy. In fact, Salsbury points out that the dismissal based on an inference that Fitzgerald would testify contrary to the interest of the employer would actually give Fitzgerald a greater incentive to freely and openly testify in conformance to public policy.

Some jurisdictions require the employer to actually make a request to the employee to commit perjury before finding the public policy against perjury is implicated. *Bushko v. Miller Brewing Co.*, 134 Wis.2d 136, 396 N.W.2d 167, 170 (1986); *see Meehan v. Amax Oil & Gas, Inc.*, 796 F.Supp. 461, 468 (D.Colo.1992) (employer never directed employee to act in certain way and never specifically prohibited employee from exercising privilege). Thus, a discharge based on an employer's concern that the employee will testify truthfully if asked to testify or that the employee intends to testify contrary to the interests of the employer is insufficient to support a cause of action under the public policy exception. *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983) (public policy must be clearly identifiable, "[n]o employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because

the public may have derived some benefit from it"). Other jurisdictions limit the action by requiring an unmistakable threat to the public policy. *See Daniel v. Carolina Sunrock Corp.*, 335 N.C. 233, 436 S.E.2d 835, 836 (1993) (statement by employer reminding employee for whom she worked and to say as little as possible prior to providing testimony was insufficient to implicate the public policy against the perjury).

▬▬▬▬ We believe the dismissal of an employee can jeopardize public policy when the employee has engaged in conduct consistent with public policy without a request by the employer to violate public policy just as it can when the employee refuses to engage in conduct which is inconsistent with public policy when requested by the employer. The focus is on the adverse actions of the employer in response to the protected actions of the employee, not the actions of the employer which may give rise to the protected actions of the employee. Furthermore, in considering whether the dismissal undermines public policy, we not only look to the impact of the discharge on the dismissed employee, but the impact of the dismissal on other employees as well. Public policy applies to all employees. If the dismissal of one employee for engaging in public policy conduct will discourage other employees from engaging in the public policy conduct, public policy is undermined.

In this case, if Salsbury was motivated to dismiss Fitzgerald because he intended to testify truthfully in a future lawsuit, a dismissal would have a chilling effect on other employees by discouraging them from engaging in similar conduct. *See Lara*, 512 N.W.2d at 782. Thus, it makes no difference that a dismissal in this particular case may give the employee an enhanced incentive to testify after a dismissal. The action by the employer could inhibit other employees from truthfully testifying in the future out of fear of dismissal.

Salsbury further argues that interpreting the tort to include conduct alleged by Fitzgerald will open the floodgates to litigation for wrongful discharge on public policy grounds whenever an employee internally expresses reservations over the termination of a co-employee and then is later dismissed for some valid reason unrelated to the prior termination of the co-employee. This argument, however, can be made to practically every public policy claim which serves as the basis for a wrongful discharge action. *See Page*, 480 S.E.2d at 826. Yet, it is up to the fact finder, in most instances, to determine whether any particular case has merit. We simply recognize a tort for discharge in violation of a public policy to provide truthful testimony, and leave it to the jury to determine if the facts support the claim. The action in this case is based in part upon an internal complaint by the employee, but is enough to withstand summary judgment because the context of the internal complaint justifies an inference of an intent to testify against the employer which may have caused the employer to dismiss the employee.

### 5. Causation Element.

We next consider if the evidence is sufficient to support a causal connection between the conduct engaged in by Fitzgerald and the discharge. The protected conduct must be the determinative factor in the decision to terminate the employee. *Teachout*, 584 N.W.2d at 301–02. Of course, if the employer has no knowledge the employee engaged in the protected activity, causation cannot be established. *Id.*; Perritt §§ 7.21–.22, at 54–55. Similarly, the existence of other legal reasons or motives for the termination are relevant in considering causation.

The causation standard is high, and requires us to determine if a reasonable fact finder would conclude Fitzgerald's intent to testify truthfully was the determinative factor in the decision to dis-

charge him. *Teachout*, 584 N.W.2d at 300. Generally, causation presents a question of fact. Thus, if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute. Perritt § 7.21, at 54. Additionally, any dispute over the employer's knowledge of the conduct is generally for the jury, as well as the existence of other justifiable reasons for the termination.

In this case, the different inferences to be drawn from the evidence preclude summary judgment. After a recommendation was made to Salsbury to terminate Koresh, Salsbury wanted to know if Fitzgerald supported Koresh. Salsbury further expressed disapproval over the support Fitzgerald gave Koresh. Moreover, Salsbury gathered this information in the context of a potential lawsuit threatened by Koresh. In light of these inferences, summary judgment was improper.

### IV. Conclusion.

We conclude the court erred in granting summary judgment. We reverse the decision of the district court and remand the case for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except LAVORATO, J., who takes no part.