**IN THE COURT OF APPEALS OF IOWA**

No. 14-1544
Filed October 14, 2015


**JACOB HACKMAN,**
    Plaintiff-Appellee,

**vs.**

**NEW HAMPTON MUNICIPAL LIGHT PLANT,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Chickasaw County, Margaret Lingreen, Judge.


New Hampton Municipal Light Plant appeals from judgment entered on a jury verdict of wrongful discharge of its former employee, Jacob Hackman, and from the district court's order awarding Hackman attorney fees. **AFFIRMED.**


Joel J. Yunek of Yunek Law Firm, P.L.C., Mason City, for appellant.

David H. Skilton of Cronin, Skilton & Skilton, P.L.L.C., Charles City, for appellee.


Heard by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

New Hampton Municipal Light Plant ("Plant") appeals from judgment entered on a jury verdict of wrongful discharge of its former employee, Jacob Hackman, and from the district court's order awarding Hackman attorney fees.

**I. Factual and Procedural Background**

Hackman was hired by the Plant in June 2008 as an operator. He understood he was to be trained as a lineman as well to enable him to perform additional tasks in the course of his employment. Hackman and his coworker, David Hauser, reported to Gregory Heying, another operator. Brian Geschke was the Plant's manager.

Heying and Geschke operated a scheme in which they sold the Plant's scrap metal for cash. The scrap metal belonged to the Plant—which was owned by the city of New Hampton—but Geschke would retain the proceeds and use the money for purposes unrelated to the operation of the Plant, buying flowers, cards, and gifts and throwing a Christmas party. On June 13, 2011, Hackman observed Heying selling scrap metal for cash and took a photograph of the transaction in progress. Hackman confronted Heying about the transaction, and Heying stated he was going to give the money to Geschke.

Later in the fall of 2011, Geschke gave each Plant employee $1000 in cash and told them to be discreet about the money. Hackman accepted the money. He later testified he felt "forced" to take the money; he believed his job was on the line if he appeared to cause trouble for Geschke. Hackman was unsettled by the distribution of cash, but he did not act to report it until the following spring.

In April 2012, Hackman reported to a member of the Plant's board of trustees, Larry Throndson, other concerns he had with the operations of the Plant, but he did not report the disbursement of cash from the scrap metal sale. Following his conversation with Throndson, Hackman informed Hauser that Throndson could be trusted to handle their concerns about the cash distribution. Without Hackman's knowledge, Hauser approached Throndson on May 7, 2012. Hauser showed Throndson the cash he had received and explained where it came from. Throndson said he would investigate.

Hackman and Hauser had agreed to approach Throndson together, which they did on May 8, 2012. The two intended to disclose other concerns to Throndson on that day, purportedly to test Throndson's trustworthiness. Throndson mentioned the cash disbursements, which alerted Hackman to the fact that Hauser had already initiated contact about the scrap metal proceeds. The next day, May 9, 2012, Hackman and Hauser again approached Throndson. They both relinquished their shares of the cash to Throndson and provided Throndson with additional details about the scrap metal scheme. Both men asked Throndson to protect their identities.[1] Hackman went on to cooperate with the county deputy sheriff who led the ensuing investigation about the recycling-for-cash adventure. He provided the deputy with the photograph he took of the transaction that occurred on June 13, 2011.

After the scrap metal scheme was exposed, Geschke left the Plant. An interim manager—Leon Rodas—was appointed. Rodas testified the Plant was

---

[1] Though Throndson agreed to maintain Hackman's anonymity, Geschke and Heying both testified they believed Hackman to have been the one to blow the whistle on them even before he was identified.

staffed at "a bare minimum" when he began work as interim manager. An email thread between New Hampton's city clerk and the chairman of the Plant's board of trustees exchanged on November 14, 2012, indicates Rodas made a "recommendation to remove the employee reporting issues." The email is not clear as to whether the recommended removal was to be from the board's agenda or from a workforce. In the email, the chairman stated the Plant's new manager should deal with employees' reporting of issues as a matter of the Plant's policy.

On December 3, 2012, Brian Quirk assumed the Plant manager role and relieved interim manager Rodas. On January 8, 2013, Quirk suspended Hackman without pay for three days. Hackman was surprised by the suspension—it was not preceded by any formal warnings or other discipline, and no concerns with Hackman's work performance had been raised with Hackman.[2] Quirk requested Heying's presence to witness the suspension.

Soon after Hackman returned to work—on January 22—Quirk laid him off. Quirk requested Heying and another employee whom Hackman had reported for

---

[2] Quirk claimed the suspension was justified based on three separate incidents. First, Hackman left unapproved union literature on a desk in a common area. Hackman removed the literature when prompted, but Quirk asserted Hackman was defensive and used profanity when Quirk confronted him. Second, Hackman had asked Quirk to address concerns with other employees' personal use of the Plant's truck. Quirk offered to make a policy change as to the truck's usage. Hackman believed Quirk's suggestion was an insufficient remedy to the problem and publically stated before the Plant's board that Quirk was not rectifying the issue. Third, Quirk had directed Hackman to locate an underground service wire. Hackman refused, indicating that task was the responsibility of the linemen. (Though Hackman had been hired with the understanding he would be trained as a lineman, no such training ever occurred.) In his written suspension notice, Quirk cited Hackman for "failure to demonstrate courteous and respectful behavior" and other violations of the Plant's personnel policies. Heying testified at trial that he was not aware of any other employee being disciplined for leaving literature on their desk as Hackman had. He also confirmed it was not Hackman's duty as an operator to locate active underground wiring.

misuse of Plant property, Travis Schumacher, be present to witness Hackman's termination. Although Quirk asserted the lay-off was necessitated by a lack of work, a new lineman had been recently hired. Soon after Hackman's employment was terminated, two more employees were hired as linemen and were also being trained as operators.

Hackman filed his petition at law on March 6, 2013. The petition included a tort action for retaliatory wrongful discharge and a claim of a violation of Iowa's whistleblower statute, Iowa Code section 70A.29 (2013).[3] At trial, the Plant moved for directed verdict at the close of Hackman's case and again at the close of its defense, claiming Hackman did not fall within Iowa's whistleblower protection laws and there was insufficient evidence to present the wrongful-discharge claim to the jury. The district court denied the motions. The wrongful-discharge claim was submitted to the jury, and the district court reserved ruling on the statutory whistleblower claim until the jury returned its verdict. The jury found the Plant liable for wrongful discharge and found Hackman suffered $79,849 in damages in lost past earnings.

The Plant moved for judgment notwithstanding the verdict or in the alternative for a new trial. The district court denied the motion and entered judgment on the jury verdict for wrongful discharge. The court then ruled Hackman had proved his statutory claim under the whistleblower statute. Because Hackman had recovered his lost-earnings damages through the jury verdict, the court awarded Hackman only attorney fees as damages on the

---

[3] Iowa Code section 70A.29(1) provides in part, "A person shall not discharge an employee . . . as a reprisal for a disclosure of any information by that employee . . . if the employee reasonably believes the information evidences a violation of law or rule . . . ."

statutory claim. The Plant now appeals the district court's entry of judgment on the jury verdict and its order as to the statutory claim.

## II. Standard and Scope of Review

"[T]he existence of a public policy, as well as the issue whether that policy is undermined by a discharge from employment, presents questions of law for the court to resolve"; we review for errors at law. *See Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000).

We review the Plant's question of the interpretation of Iowa Code section 70A.29 for correction of errors at law. *See L.R. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 393 (Iowa 2012); *see also Zwanziger v. O'Brien*, No. 11-1548, 2012 WL 4513836, at *1 (Iowa Ct. App. Oct. 3, 2012).

We review the district court's denials of the Plant's motions for directed verdict for errors at law. *See Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008).

> In doing so we view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury. If substantial evidence in the record supports each element of a claim, the motion for directed verdict must be overruled. When reasonable minds would accept the evidence as adequate to reach the same findings, evidence is substantial. On appeal our role is to determine whether the trial court correctly determined there was sufficient evidence to submit the issue to the jury.

*Id.* (citations omitted).

## III. Whistleblower Protections

The Plant's first two claims on appeal assert Hackman should not be protected either as a whistleblower pursuant to Iowa Code section 70A.29 or under the public-policy exception to the Plant's right to discharge an employee at will.

A. Public Policy

Because Iowa is an at-will employment state, "the employment relationship is terminable by either party at any time, for any reason, or no reason at all." *Fitzgerald*, 613 N.W.2d at 280 (citation and internal quotation marks omitted). However, Iowa has carved out a "public-policy exception to the general rule of at-will employment for wrongful-discharge claims." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013). An employee seeking the protection of the public-policy exception must establish "(1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; [and] (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee . . . ." *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109–10 (Iowa 2011).[4] "The first two elements constitute questions of law to be determined by the court." *Dorshkind*, 835 N.W.2d at 300.

The Plant argues on appeal Hackman should not be protected under the public-policy exception or Iowa Code section 70A.29 because he purportedly blew the whistle on his own misconduct, placing him outside the scope of the intended protected class. The Plant's claim is a challenge to the district court's determination as to the first two elements of the public-policy exception.

---

[4] In delineating the elements of this tort claim, *Berry* also discusses whether "the employer had no overriding business justification for the discharge" as an element to be established by the employee. *Berry*, 803 N.W.2d at 110. However, our supreme court has recently clarified employees do not bear the burden to prove "the lack of a legitimate business justification." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898 (Iowa 2015).

First, there is a clearly defined and well-recognized public policy that protects Hackman's disclosures of wrongdoing to the Plant's board and to the deputy sheriff: the policy underlying Iowa Code section 70A.29. *See Fitzgerald*, 613 N.W.2d at 283 ("In determining whether a clear, well-recognized public policy exists . . . , we have primarily looked to our statutes . . . . Some statutes articulate public policy by specifically prohibiting employers from discharging employees for engaging in certain conduct or other circumstances.").

The Plant cites to federal case law as persuasive authority for the proposition that the whistleblower protections found in section 70A.29 should not apply to Hackman and therefore the statute should not serve as a public policy protecting Hackman's activities. *See Watson v. Dep't of Justice*, 64 F.3d 1524, 1527 n.3 (8th Cir. 1995); *Marano v. Dep't of Justice*, 2 F.3d 1137, 1142 n.5 (Fed. Cir. 1993) (citing 135 Cong. Rec. 5033 (1989)). The Plant fails to recognize these cases are distinguishable from the case before us.

In *Watson*, the Eight Circuit Court of Appeals acknowledged disclosures of one's own misconduct are not protected; however, it thereafter expressly differentiated between the plaintiff's *non-protected* disclosures of his own misconduct with his *protected* disclosures of *others'* wrongdoing. *Watson*, 64 F.3d at 1527 n.3. Even if we follow this line of reasoning in *Watson*, it merely persuades us that Hackman is not protected from discharge for his own hypothetical wrongdoing or disclosure of the same; he nevertheless *is* protected from discharge as retaliation for exposing the wrongdoings of Heying and Geschke.

The Plant cites to dicta in *Marano* expressing the Federal Circuit's belief that the federal Whistleblower Protection Act (WPA) does not protect an employee who "blew the whistle on his own misconduct in an effort to acquire the WPA's protection." *Marano*, 2 F.3d at 1142 n.5. This piece of dictum does not contemplate an employee's disclosure of his coworkers' misconduct in tandem with his own.

We disagree with the Plant's assertion that Hackman's disclosures of Heying's and Geschke's misconduct are not protected by Iowa Code section 70A.29 and its underlying public policy. The Plant's cited authorities do not support its position. The policy expressed in section 70A.29—to protect employees who reveal the misconduct of their employers from retributive discharge—applies to Hackman's disclosures about Heying and Geschke, and that policy would be undermined if Hackman's disclosures served as a determining factor in his discharge. *See Berry*, 803 N.W.2d at 109–10.

### B. "Disclosure"

The Plant's second assertion is that Hackman did not "disclose" any information when he reported the scrap metal scheme to Throndson or worked with the deputy in the ensuing investigation because the pertinent information had already been "disclosed" by Hauser to Throndson two days before Hackman did so. The statute specifically contemplates "a *disclosure* of any information . . . the employee reasonably believes . . . evidences a violation of law or rule." Iowa Code § 70A.29(1) (emphasis added).

"[S]tatutory words are presumed to be used in their ordinary and usual sense and with the meaning commonly attributed to them." *Collins v. King*, 545

N.W.2d 310, 312 (Iowa 1996). The Plant argues the term "disclose" can only mean the revelation of otherwise hidden information for the first time. Therefore, it argues, Hackman could not have disclosed the misconduct because Hauser had already done so two days prior.

The authorities cited by the Plant in support of its argument are inapposite to the claim made. It first quotes four English dictionaries, none of which reveal a definition of the term "disclose" that would categorically exclude Hackman's reports of additional, new information to Throndson or his subsequent reports to the deputy sheriff.

The cases cited are distinguishable. *See Francisco v. Office of Pers. Mgmt.*, 295 F.3d 1310, 1314 (Fed. Cir. 2002); *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1350 (Fed. Cir. 2001); *Meuwissen v. Dep't of Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000); *see also Mize-Kurzman v. Marin Cmty. Coll. Dist.*, 136 Cal. Rptr. 3d 259, 282 (Cal. Ct. App. 2012).[5] Each of these cases deals with disclosures of publicly known information, disclosures of wrongdoing to the wrongdoer himself, or disclosures that were required as part of the employee's

---

[5] The Plant relies on two further authorities. First, it misquotes a federal case—*U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 335 (D. Mass. 2011)—that does not consider whistleblower protection. The language misquoted from *Nowak* concerns the first-to-file requirement of *qui tam* actions filed by realtors under the federal False Claims Act and is patently inapplicable to this case.

Second, at oral argument, the Plant cited—over appellee's objection and in disregard of Iowa Rule of Appellate Procedure 6.908(5)—a case from the Missouri Court of Appeals. *See Hudson v. O'Brien*, 449 S.W.2d 87, 92 (Mo. Ct. App. 2014). Though the Plant ostensibly cited this case in support of its interpretation of the term "disclose," *Hudson* expressly rejects the Plant's proposed interpretation, citing to recent amendments to the WPA that abrogate prior federal court interpretations of "disclose" similar to the interpretation proposed by the Plant. *See id.* at 93–94 (citing 5 U.S.C. § 2302(8)(f)(1) (Supp. 2014)). We further note *Hudson* relates specifically to the lower court's conclusion that whistleblower protections exclude disclosures made directly to the alleged wrongdoer, which bears no factual resemblance to the case before us. *Id.*

job. Only the first of these three considerations could be relevant here. However, Hauser's prior report to Throndson did not render the scrap-metal scheme "publicly known information" because Throndson had not begun to investigate Hauser's claim or discussed it with other authorities prior to Hackman's disclosure.

Furthermore, the Plant's argument concerning the definition of the term "disclose" is not inherently persuasive. Interpreting section 70A.29 as the Plant requests would create absurd results. Under the Plant's reading of the statute, if two employees simultaneously and independently discover the same illegal act by their employer and each reports her discovery to an authority without knowledge of the other's report, the employer is free to retributively terminate whichever employee was unfortunate enough to report second in time. "We seek a reasonable interpretation that will best effect the purpose of the statute and avoid an absurd result." *IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001) (citation omitted). We therefore reject the Plant's proposed interpretation of the statute.

The record shows that Hauser's initial report to Throndson lacked meaningful specificity. When Hackman and Hauser met with Throndson the next day, Throndson had not yet had an opportunity to investigate, had no new information, and had not publicly disclosed Hauser's allegation. The record further shows Hackman provided Throndson and the deputy sheriff with additional information not revealed by Hauser—including the photograph of the scrap metal sale, information about when that transaction took place, and information derived from Hackman's personal interactions with Heying and

Geschke. Contrary to the Plant's claim, Hackman disclosed information as contemplated by Iowa Code section 70A.29.

Hackman's actions constituted disclosures that are protected by a clearly defined and well-recognized public policy. We reject the Plant's contrary claims on appeal.

**IV. Determining Factor & Overriding Business Justification**

The Plant next claims the district court should have directed a verdict in its favor because the record does not support a finding that Hackman's disclosures were the determining factor in the Plant's decision to discharge Hackman. *See Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 302 n.2 (Iowa 1998). A "determining factor" in a decision to discharge an employee is a reason that "tips the scales decisively one way or the other, even if it is not the predominant reason behind the employer's decision." *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009) (citations and internal quotation marks omitted).

The Plant points to several facts to support its claim. First, though he eventually left the Plant, Hauser—Hackman's fellow whistleblower—was not terminated. Second, Hackman's layoff occurred seven months after his disclosure. Third, the decision to discharge Hackman was Quirk's alone, was preceded by "discipline incidents," and was purportedly due to a lack of work.

Our task on appeal is to review all the evidence in the light most favorable to Hackman, even if it is contradicted by the evidence cited by the Plant. *See Dorshkind*, 835 N.W.2d at 300. The record indicates the decision to terminate Hackman was under consideration well before Quirk arrived at the Plant. The email between the city clerk and the board's chairman gives rise to a reasonable

inference that the interim manager, the clerk, and the board were already considering taking action against "the employee reporting issues."[6] The jury submitted a question to the court during its deliberation asking for clarification on the meaning of the email, apparently considering it to be significant evidence. Though Quirk—not Rodas—ultimately discharged Hackman, the record supports an inference that the Plant's intent to discharge Hackman for "reporting issues" preceded Quirk's hiring as Plant manager.

Additionally, the circumstances of Hackman's suspension—ostensibly resulting from incidents for which no other employee had been suspended previously—and discharge—almost immediately upon his return from suspension and intentionally in the presence of two of the men whose misconduct he had reported—are additional evidence from which reasonable minds could conclude Hackman's protected disclosures were the determining factor in the Plant's decision to discharge him. The question was properly submitted to the jury, which weighed and rejected the Plant's contrary evidence. The district court properly denied the Plant's motion for directed verdict on this issue.

Lastly, the Plant claims the district court should have granted its motion for directed verdict because there was "uncontroverted evidence of an overriding business justification" for Hackman's discharge. *See Rivera*, 865 N.W.2d at 899. It claims Hackman was discharged because there was no work for him and Quirk

---

[6] Though the email does not refer to Hackman by name, a juror could reasonably infer he is the topic of discussion because, unlike Hauser, Hackman reported multiple other issues with the Plant's management both before and after the whistle was blown on the scrap metal sales.

discharged him to promote the Plant's efficiency. It further claims the purported reasons for Hackman's suspension also support his discharge.

It is the employer's burden to prove an overriding business justification, and the employer will prevail on that basis only "if it convinces the fact finder that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision."[7] *Id.* The Plant failed to so convince the jury.

Despite the Plant's claim otherwise, evidence contrary to its assertion exists in the record. Though the Plant claims it never replaced Hackman's operator position following his discharge, it nevertheless hired two linemen and trained both of them to perform operator duties, filling the gap Hackman left behind. A reasonable juror could accept that evidence as adequate to reject the Plant's assertion Hackman was terminated for lack of work. A reasonable juror could also reject Quirk's asserted reasons for suspending Hackman since evidence in the record indicates other employees engaging in the same activities were not suspended or terminated.

Hackman presented evidence that a reasonable juror could conclude undermined and contradicted the Plant's claim of an overriding business justification for Hackman's discharge. We affirm the district court's denial of the Plant's motions for directed verdict.

---

[7] Our supreme court has recently acknowledged "there may be some relatively rare circumstances when an employer is entitled to an affirmative defense of an overriding business justification," in which "the employer admits the protected conduct caused the termination, but asserts another policy trumps the public policy asserted by the employee." *Rivera*, 865 N.W.2d at 899. The Plant makes no such claim in this case.

## V. Appellate Attorney Fees

Lastly, we have before us Hackman's application for attorney fees on appeal and its supporting affidavit. Hackman cites Iowa Code section 70A.29(3)(a)[8] as authority for this court to award appellate attorney fees, which states, "[A] person who [discharges an employee as a reprisal for protected disclosure] is liable to an aggrieved employee for affirmative relief including . . . any other equitable relief the court deems appropriate, including attorney fees and costs." Having affirmed the district court's ruling on Hackman's section 70A.29 claim, having reviewed the affidavit of attorney fees on appeal, and in consideration of the merits of the Plant's appeal, we award Hackman appellate attorney fees.

Hackman requests $16,016.73 in appellate attorney fees. However, we note the supporting affidavit includes $243.00 in attorney fees incurred arguing issues before the trial court on November 11, 2014. Because that matter was not related to this appeal, we award Hackman $15,773.73 in attorney fees.

## VI. Conclusion

As to the Plant's claim Hackman's activities were not protected by Iowa's whistleblower laws, we affirm the district court. As to the Plant's claim there was insufficient evidence to submit the issues to the jury, we affirm the district court. We award Hackman appellate attorney fees in the amount of $15,773.73.

**AFFIRMED.**

---

[8] Hackman's application cites section 70A.29(3)(b), but we conclude from the content of his application he intended to cite to section 70A.29(3)(a).