# In the Iowa Supreme Court

No. 22–2021

Submitted September 24, 2024—Filed December 6, 2024

**Todd P. Halbur,**

Appellee,

vs.

**Stephen Larson,** in his official capacity as administrator of the Alcoholic Beverages Division,

Appellant.

---

Appeal from the Iowa District Court for Polk County, David Nelmark, judge.

The defendant appeals from a jury verdict finding him liable for wrongful termination in violation of Iowa Code section 70A.28, and the plaintiff cross-appeals from the district court's dismissal of his additional claim for wrongful discharge in violation of public policy. **Affirmed.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Oxley, McDermott, and May, JJ., joined. Mansfield, J., filed a dissenting opinion.

Brenna Bird, Attorney General; Patrick C. Valencia (argued), Deputy Solicitor General; Tessa M. Register (until withdrawal), Assistant Solicitor General; and Christopher J. Deist and Ryan P. Sheahan, Assistant Attorneys General, for appellant.

Stuart L. Higgins (argued) and Grant M. Rodgers of Higgins Law Firm, P.L.L.C., West Des Moines, for appellee.

**McDonald, Justice.**

Todd Halbur was fired from his position as comptroller of the Iowa Alcoholic Beverages Division (ABD). Halbur believed he was fired in retaliation for (1) disclosing to his supervisor, Administrator Stephen Larson, the head of ABD, that ABD was operating in violation of Iowa law and (2) for refusing to engage in illegal acts. Halbur filed this suit against Larson, among others, and asserted a statutory claim for wrongful discharge and a common law claim for wrongful discharge in violation of public policy. The district court submitted the statutory claim to a jury but dismissed the wrongful discharge claim on the ground that the statutory claim was the exclusive remedy allowed under the circumstances. The jury returned a verdict in favor of Halbur and awarded him $1 million in damages, which was reduced pursuant to a statutory cap on damages. In this appeal and cross-appeal, Larson contends Halbur's statutory claim fails as a matter of law, and Halbur contends the district court erred in dismissing his common law claim for wrongful discharge in violation of public policy.

I.

In April 2015, Halbur was hired as comptroller of ABD. ABD "administer[s] and enforce[s] the laws of this state concerning alcoholic beverage control." Iowa Code § 123.4 (2020). Among its many responsibilities, ABD wholesales liquor in the state to licensed retailers. As comptroller of ABD, Halbur managed and advised on a variety of financial and operational matters, including accounting, cash management, inventory control, and auditing. When Halbur was hired, he initially reported to Chief Operating Officer (COO) Tim Iverson. After Iverson left employment with ABD, Halbur started reporting directly to Larson. That reporting change occurred in November 2016.

In August 2017, Halbur raised concerns with Larson that ABD's purchasing, pricing, and accounting practices resulted in ABD selling alcoholic liquor in violation of Iowa law. Specifically, Halbur believed that ABD was exceeding the 50% markup allowed under Iowa law:

> The price of alcoholic liquor sold by the division shall include a markup of up to fifty percent of the wholesale price paid by the division for the alcoholic liquor. The markup shall apply to all alcoholic liquor sold by the division; however, the division may increase the markup on selected kinds of alcoholic liquor sold by the division if the average return to the division on all sales of alcoholic liquor does not exceed the wholesale price paid by the division and the fifty percent markup.

Iowa Code § 123.24(4) (2017). The alleged violation was caused by ABD's purchasing, pricing, and accounting practices relating to buyouts of inventory from manufacturers and the amounts paid to manufacturers during temporary price reductions that manufacturers offered to retailers. The details of the purchasing, pricing, and accounting practices related to buyouts and temporary price reductions are not relevant to the resolution of this case, and we need not explain them in any further detail.

Halbur became aware of these issues when he participated in interviews with a consulting firm that ABD had hired to review ABD's practices. While the issues revealed to Halbur through the consulting firm's interview process might have been new to Halbur, the issues were not new to ABD. In 2013, former ABD administrator Lynn Walding expressed concern about whether ABD's purchasing, pricing, and accounting practices resulted in excessive price markups. Walding raised this concern after he had left ABD and was working for an alcoholic beverage company. ABD management investigated and learned that ABD had charged an average annual markup of 50.9%. However, ABD management also determined there was no violation of Iowa Code section 123.24.

It appears that after the investigation and analysis, the markup issue was left alone until Halbur raised it again.

After Halbur reported these issues to Larson, ABD took action to resolve them. Following Halbur's recommendation, ABD ceased the buyout practice in November 2017. In January 2018, an ABD product manager discovered a fix for the accounting issue related to temporary price reductions and sought Halbur's approval to implement it. Halbur allegedly delayed approving the fix until May. Whatever the cause of the delay, the fix was implemented in May 2018. Around this same time, Halbur expressed to Larson that he believed the purchasing, pricing, and accounting practices should be reported to the Governor, auditor of state, attorney general, and legislature. Neither Halbur nor Larson ever contacted any of these officials regarding the issues Halbur raised.

Halbur reported a second alleged violation of Iowa law to Larson in January 2018 relating to public procurement laws. *See id.* § 8A.311; Iowa Admin. Code rs. 11—117.3, 11—117.5 (2017). In June 2017, Larson, on behalf of ABD, entered into a service contract with Beverage Merchandising, Inc. (BMI) without soliciting competitive bidding. Under the contract, BMI was to provide ABD with a website and certain software services, and ABD was to pay BMI $3,500 per month for the services. As comptroller, Halbur approved payment of four or five invoices BMI sent to ABD before asking to review the contract in January 2018. After reviewing the contract, Halbur concluded the contract was unlawful because it was not procured via competitive bidding and shared this opinion with Larson. In June 2018, Halbur refused to sign off on a payment to BMI and again shared with Larson that he believed the contract was unlawfully procured.

At trial, Larson testified that he drafted the contract with BMI, that he did not believe that he needed to put the project out for public bidding because this was a sole source contract, and that he talked to Karl Wendt at the Iowa Department of Administrative Services (DAS) about the contract with BMI because he wanted to make sure he was complying with the law. He testified that after he spoke with Karl, Karl stated, "It's an agreement you want to do. I don't need to see anything, and neither does DAS." Larson testified that, in his discretion as the head of ABD, he concluded that public bidding was not needed.

Regardless, shortly after Halbur refused to sign off on further payments to BMI and shortly after Halbur reiterated his belief that the contract was procured unlawfully, Larson changed Halbur's reporting relationship. Larson returned Halbur's supervision to the COO of ABD, now Herb Sutton. Larson explained that he changed Halbur's reporting relationship because issues with Halbur's leadership had come to a head due to Halbur's struggles with personnel management. Larson hoped Sutton could improve Halbur's performance.

It was not to be, however. Only a few days after Larson directed that Halbur report directly to Sutton, Sutton decided to terminate Halbur's employment. Sutton made the recommendation to Larson, and Larson did not object. Sutton signed a letter dated July 24, 2018, terminating Halbur's employment and provided it to Halbur around the same time. There was no reason for termination of employment given in the letter.

In December 2019, Halbur filed this suit against the State of Iowa, ABD, and Larson. Halbur alleged his employment was terminated in retaliation for his internal reports regarding the allegedly unlawful price markups and the allegedly unlawful procurement of the BMI contract and in retaliation for his refusal to authorize additional payments to BMI. Halbur asserted claims for: (1) wrongful

discharge in violation of public policy against the State of Iowa, ABD, and Larson in his official capacity; (2) wrongful discharge in violation of public policy against Larson in his individual capacity; (3) wrongful discharge in violation of Iowa Code section 70A.28 against the State of Iowa, ABD, and Larson in his official capacity; and (4) wrongful discharge in violation of Iowa Code section 70A.28 against Larson in his individual capacity. In an amended petition, Halbur dropped his statutory claim against Larson in his individual capacity.

We have referred to section 70A.28 as "the whistleblower statute." *Hedlund v. State*, 930 N.W.2d 707, 712 (Iowa 2019). That section establishes a public policy against retaliatory discharge of public employees and considers the violation of the statute to be a public harm. *Id.* at 716. Section 70A.28 provides:

> 2. A person shall not discharge an employee from or take or fail to take action regarding an employee's appointment or proposed appointment to, promotion or proposed promotion to, or any advantage in, a position in a state employment system administered by, or subject to approval of, a state agency as a reprisal for a failure by that employee to inform the person that the employee made a disclosure of information permitted by this section, or for a disclosure of any information by that employee to a member or employee of the general assembly, a disclosure of information to the office of ombudsman, a disclosure of information to a person providing human resource management for the state, or a disclosure of information to any other public official or law enforcement agency if the employee, in good faith, reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

Iowa Code § 70A.28(2) (2020). The same statute establishing a public policy against retaliatory discharge of public whistleblowers also created a civil action enforcement mechanism, which is the statutory cause of action Halbur asserted in this case. *See id.* § 70A.28(5).

The defendants moved to dismiss Halbur's claims. First, they argued that Halbur's claims for wrongful discharge in violation of public policy should be

dismissed because Halbur's exclusive remedy is the civil action authorized by section 70A.28(5). Second, they contended that count three should be dismissed with respect to the State of Iowa and ABD because the statute allows only civil suits against an individual person and not against government entities. *See id.* § 70A.28(2), (5)(*a*). Third, they claimed that the statutory whistleblower claims should be dismissed because Larson failed to report the alleged wrongdoing to one of the "enumerated persons or entities as required by Iowa Code § 70A.28(2)." More specifically, the defendants argued that Halbur never "specifically state[d] that he disclosed this alleged wrongdoing to any state official or agency as required by Iowa Code § 70A.28."

The district court granted in part the defendants' motion to dismiss. The district court dismissed Halbur's common law claims for wrongful discharge in violation of public policy. The district court reasoned that "the public policy reasons for which Plaintiff claims to be wrongfully discharged are covered by section 70A.28(2) and the remedies that section provides for a proven violation are comprehensive." In short, the statutory claim was the exclusive remedy for wrongful discharge under the facts alleged. The district court dismissed the statutory claims against the state and ABD on the ground that a claim under section 70A.28 can be asserted only against an individual person and not against the state or its subdivisions. Finally, the district court denied Larson's motion to dismiss the statutory claim against him. The district court reasoned that the statute prohibits reprisals for reports of unlawful conduct made "to any other public official." *Id.* § 70A.28(2). "Plaintiff elected to whistle blow to a public official who happened to be his agency's administrator." In the district court's view, the statute did not carve out causes of action for reports to public officials who also happened to be the whistleblower's supervisor.

After the parties engaged in discovery, Larson moved for summary judgment on the remaining statutory claim against him. He argued that neither incident Halbur complained of—the excess price markup and the BMI contract—qualified as a "disclosure" within the meaning of section 70A.28 because Larson and ABD already knew of the conduct. Larson also argued that there was no evidence that Halbur's alleged disclosures were causally related to the termination of Halbur's employment. The district court initially granted the motion in part and denied it in part. The district court disagreed with Larson that there were no disclosures here, but the district court concluded that there was no triable issue of fact on whether Halbur's reports regarding the excess price markups led to his termination. Halbur filed a motion to reconsider, arguing that his reports regarding excess price markups and the failure to solicit competitive bids should be considered together on the question of causation. The district court granted Halbur's motion to reconsider. It reasoned that it "ma[de] sense to treat the whistleblowing collectively. It would be asking the jury to make too fine a distinction to ascertain which instance of whistleblowing was the determining factor."

The case then proceeded to trial. At trial, Larson did not object to the marshaling instruction provided to the jury. He did not move for directed verdict at the close of Halbur's case, and he did not make any motion for judgment at the close of all the evidence. The jury returned a verdict in favor of Halbur and awarded him $1 million for lost wages and emotional distress. After receiving the jury's verdict, Larson did not move for a judgment notwithstanding the verdict. Instead, he filed a motion to reduce Halbur's damages award in accord with the statutory cap on damages for claims under section 70A.28. *See id.* § 70A.28(5).

The district court granted that motion and entered judgment for Halbur in the amount of $351,000.

## II.

The sole issue Larson raises in this appeal is whether Halbur's conduct—complaining to his supervisor about his supervisor regarding matters within his normal job duties—constituted a protected disclosure under section 70A.28. Relying on federal precedent, Larson argues that section 70A.28 does not apply when an employee makes an internal complaint to the employee's supervisor about the supervisor's own conduct. *See Huffman v. Off. of Pers. Mgmt.*, 263 F.3d 1341, 1349–50 (Fed. Cir. 2001), *superseded by statute*, Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112–199, § 101(b)(2)(C), 126 Stat. 1465, 1465–66. Larson argues that the statute only protects a disclosure of information. Disclosure, according to Larson, requires the revelation of information hidden or not known. *See id.* An employee cannot disclose misconduct by a wrongdoer to the wrongdoer, according to Larson, because the wrongdoer already knew of the allegedly unlawful conduct. *See id.* at 1350.

We need not reach the merits of Larson's argument to resolve this appeal because Larson did not preserve this issue for appeal. Larson contends that the issue of error preservation is not before the court because Halbur has not contested error preservation on appeal. The argument is not entirely correct as a factual matter and wholly immaterial as a legal matter. Factually, Halbur filed a motion for leave to amend his brief to contest error preservation and a motion to dismiss the appeal raising a similar argument, but this court denied the motions. Legally, even if Halbur had not raised the issue, "this court will consider on appeal whether error was preserved despite the opposing party's omission in

not raising this issue at trial or on appeal." *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) (en banc).

Larson asserts that he preserved error on this issue by raising this issue in his motion to dismiss. We disagree. Under the Iowa Rules of Civil Procedure, a party may move to dismiss a claim on the ground that the petition fails "to state a claim upon which any relief may be granted." Iowa R. Civ. P. 1.421(1)(*f*). The denial of such a motion is interlocutory. To preserve error on an issue raised under rule 1.421(1)(*f*), a party is required to raise the issue again in a motion for directed verdict at the close of the plaintiff's evidence and renew the motion at the close of all the evidence. *See Mueller v. St. Ansgar Bank*, 465 N.W.2d 659, 660 (Iowa 1991) (stating that this rule has been "settled" law in Iowa since 1915 (quoting *Ball v. Davenport*, 152 N.W. 69, 71 (Iowa 1915))). Larson did not file a motion for directed verdict and did not renew the motion at the close of evidence.

We recently reaffirmed the settled rule regarding error preservation with respect to the denial of a pretrial motion for judgment as a matter of law in *Jones v. Glenwood Golf Corp.*, 956 N.W.2d 138 (Iowa 2021). In that case, the defendant filed a motion for summary judgment but "failed to renew its . . . legal argument by motion for directed verdict at trial." *Id.* at 143. We explained that even when the pretrial motion raises a purely legal issue, the moving party "must do more to preserve the issue for appellate review." *Id.* The defendant must raise the same issue at trial in a motion for directed verdict and renew the motion at the close of all the evidence. *See Estes v. Progressive Classic Ins.*, 809 N.W.2d 111, 114 (Iowa 2012) ("We have consistently applied this rule when presented with an appeal from the denial of a motion for summary judgment once the case has proceeded to trial."). In effect, "[t]he denial of a motion for summary judgment is no longer appealable once the matter proceeds to a trial on the merits."

*Lindsay v. Cottingham & Butler Ins. Servs.*, 763 N.W.2d 568, 572 (Iowa 2009); *see also Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) ("After a full trial on the merits, a previous order denying a motion for summary judgment is no longer appealable or reviewable."), *overruled in part on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016).

While *Jones* involved a motion for summary judgment, the same rule applies with greater force to an issue raised in a motion to dismiss that precedes the motion for summary judgment. *See* 956 N.W.2d at 142; *see also Bennett v. Pippin*, 74 F.3d 578, 585 (5th Cir. 1996) ("The arguments for not considering an appeal from a denial of a Rule 12(b)(6) [motion to dismiss] after a trial on the merits are stronger than those for not considering a refusal to dismiss under Rule 56 [summary judgment]."). It would be illogical to hold that the denial of a motion to dismiss challenging the pleadings preserves an issue for appellate review while also holding that the denial of a subsequent motion for summary judgment, perhaps raising the same issue, does not preserve an issue for appellate review. It is thus well accepted that "a failure to sustain a motion to dismiss . . . may not in and of itself be assigned as reversible error." *Mims v. Cent. Mfrs. Mut. Ins.*, 178 F.2d 56, 59 (5th Cir. 1949). To preserve the issue for appellate review, "the moving party can, and in general is required, upon the trial to renew and support his pleaded objections . . . by requesting rulings . . . from the Court . . . which he deems necessary to protect and preserve the point asserted by his motion to dismiss." *Id.*

There is an exception to this general rule: an order denying a motion to dismiss challenging the district court's jurisdiction or authority preserves the challenge for appellate review even without further motion practice or objections. *See generally Meier v. Senecaut*, 641 N.W.2d 532, 541 n.2 (Iowa 2002)

(discussing error preservation and drawing distinctions between subject matter jurisdiction, personal jurisdiction, and authority). For example, in *Schooler v. Iowa Department of Transportation*, the state department of transportation moved to dismiss what it believed was an untimely challenge to a condemnation award issued by a local compensation commission. 576 N.W.2d 604, 605 (Iowa 1998) (en banc). The district court denied the motion to dismiss. *Id.* The matter proceeded to trial, and the jury awarded the condemnees $100,000. *Id.* at 605–06. On appeal, we concluded that the department's challenge to the district court's authority to hear the case was preserved for appellate review even though the department did not raise the authority issue in later motions or at trial. *See id.* at 607.

But the exception to the general rule is not applicable here. Here, Larson does not challenge the district court's jurisdiction or authority. *See* Iowa R. Civ. P. 1.421(1)(*a*)–(*c*). Instead, Larson's contends only that Halbur's petition failed to state a claim upon which relief could be granted. *See id.* r. 1.421(1)(*f*). To preserve error on an argument that the plaintiff failed to state a claim upon which no relief can be granted, the defendant must raise the issue at trial. *See Bennett*, 74 F.3d at 585 ("When the plaintiff has prevailed after a full trial on the merits, a district court's denial of a [motion to dismiss] becomes moot."); *Tech. Comput. Servs., Inc. v. Buckley*, 844 P.2d 1249, 1252 (Colo. App. 1992) ("Similarly, any errors asserted concerning a trial court's ruling denying a motion to dismiss for failure to state a claim are capable of preservation for review on appeal by other means. To the extent that such issues are not so preserved, they are deemed to have been waived."); *Robinson v. Singh*, 303 So. 3d 65, 74 (Miss. Ct. App. 2020) (holding that "a defendant may not appeal the pretrial denial of a Rule 12(b)(6) motion to dismiss" and the defendant failed to preserve error on the issue where

the defendant did not "move for a directed verdict or file a motion for judgment notwithstanding the verdict or any other post-trial motions"); *Ammondson v. Nw. Corp.*, 220 P.3d 1, 17 (Mont. 2009) (holding party failed to preserve issue in pretrial motion to dismiss where same points were not raised during or after trial); *Paradise Inc. v. Pierce County*, 102 P.3d 173, 177 (Wash. Ct. App. 2004) (stating to preserve error with respect to a motion to dismiss for failure to state a claim, the party must renew the issue at trial).

Larson also contends that he preserved error on his motion to dismiss during a pretrial argument on a motion in limine. During the argument on the motion in limine, the district court stated to Larson's counsel, "To the extent that another judge in this case has ruled [Larson] is properly a public official for purposes of this case, that's the law in this case, and you are not waiving anything." The district court was referring to the ruling on the motion to dismiss in which a different judge held that Larson was a public official within the meaning of the statute. Larson contends that the district court's statement that he was "not waiving anything" preserved error on the denial of his motion to dismiss.

Setting aside the important distinctions between waiver and error preservation, the district court's statement during the motion in limine hearing did not preserve error with respect to the ruling on the motion to dismiss. Error preservation requires a final ruling on a specific motion or request. The denial of a motion to dismiss is interlocutory, not final, and "does not conclusively determine the merits of the issues presented in the petition." *City of Iowa City v. Hagen Elecs., Inc.*, 545 N.W.2d 530, 534 (Iowa 1996) (quoting *City of Ankeny v. Armstrong Co.*, 353 N.W.2d 864, 868 (Iowa Ct. App. 1984)); *see also Ahls v. Sherwood/Div. of Harsco Corp.*, 473 N.W.2d 619, 624 (Iowa 1991) ("An

interlocutory order is not the law of the case because the court is free to change it at a later time."); *Avoca State Bank v. Merchs. Mut. Bonding Co.*, 251 N.W.2d 533, 539 (Iowa 1977) (en banc) ("The 'law of the case' arises only after a ruling becomes final."). The district court's denial a motion to dismiss for failure to state a claim thus "cannot be considered an adjudication for purposes of applying . . . 'law of the case' principles to preclude further litigation on the merits of the controversy." *Hagen Elecs.*, 545 N.W.2d at 534 (quoting *Armstrong Co.*, 353 N.W.2d at 868). To bring finality to the ruling on the motion to dismiss and to preserve error on the claim, the party seeking relief must obtain interlocutory review of the denial of the motion to dismiss or must move for directed verdict and renew the motion at the close of evidence. None of those things happened here.

Error preservation rules are not legal bramble bush intended to serve no purpose other than ensnaring unwitting litigants, and this case demonstrates their utility. Larson presented one legal argument in his motion to dismiss. By his own admission, he presented a "separate but related approach" in his motion for summary judgment. He then allowed the case to go to trial on a different legal theory without any objection to the instructions, without making a motion for directed verdict, and without renewing the motion for directed verdict. In the absence of our long-settled error preservation rule, Larson would now get to cherry-pick the best way to attack the jury's verdict and district court judgment without ever finalizing a legal theory and presenting it to the district court during trial. Our settled error preservation rule disallows this type of "sandbagging— that is, it does not 'allow a party to choose to remain silent in the trial court in the face of error, tak[e] a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable.' " *State v.*

*Crawford*, 972 N.W.2d 189, 199 (Iowa 2022) (alteration in original) (quoting *State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015)). Larson failed to preserve error in this case, and we need not discuss his appeal any further.

III.

In his cross-appeal, Halbur contends the district court erred in dismissing his claim for wrongful discharge in violation of public policy. The district court concluded that Halbur could not assert claims for wrongful discharge in violation of public policy because section 70A.28 provides a comprehensive civil remedy, rendering the common law wrongful discharge claim unnecessary. We review the district court ruling on the motion to dismiss for the correction of errors at law. *See Worthington v. Kenkel*, 684 N.W.2d 228, 230 (Iowa 2004).

"Absent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (en banc). "This means the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.'" *Id.* (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)). This court, like many other courts, has adopted a limited exception to the employment-at-will doctrine by creating an implied cause of action for wrongful discharge in violation of public policy. *See, e.g.*, *Springer v. Wks. & Leo Co.*, 429 N.W.2d 558, 559–60 (Iowa 1988) (en banc).

Since we first recognized the tort in the *Springer v. Weeks & Leo Co.* decision, this court has repeatedly emphasized that a claim for wrongful discharge in violation of public policy is a narrow exception to employment at will and that the court will proceed cautiously before recognizing a new implied cause of action. *See, e.g., Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa

2013) ("The narrow public-policy exception to the at-will employment doctrine 'limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state.' " (quoting *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011))); *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303 (Iowa 2013) ("Thus, the exception is narrowly circumscribed to only those policies clearly defined and well-recognized to protect those with a compelling need for protection from wrongful discharge."); *Berry*, 803 N.W.2d at 109 (describing the tort as a "narrow" exception to general rule of at-will employment); *Ballalatak v. All Iowa Agric. Ass'n*, 781 N.W.2d 272, 275 (Iowa 2010) (stating the tort is a "narrow exception" to the employment-at-will doctrine); *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009) ("[T]he tort of wrongful discharge should exist in Iowa only as a narrow exception to the employment-at-will doctrine."); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 229 (Iowa 2004) (stating we must proceed with caution before creating an implied cause of action); *Davis v. Horton*, 661 N.W.2d 533, 536 (Iowa 2003) (stating we must "proceed cautiously" in recognizing an implied cause of action); *Fitzgerald*, 613 N.W.2d at 283 ("Thus, we must proceed cautiously when asked to declare public policy to support an exception to the at-will doctrine . . . .").

Because the tort is a narrow exception to the employment-at-will doctrine, it is not enough for this court to rely on "generalized concepts of fairness and justice" in determining whether the tort should be allowed. *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 686 (Iowa 2001). Nor is it enough for this court to merely identify a statute evidencing a public policy because all statutes are enacted to advance some public policy, presumably. Instead, this court will imply a cause of action for wrongful discharge in violation of public policy only where

the public policy is "clearly defined and well-recognized" and there is a "compelling need" for a cause of action to enforce or vindicate the public policy at issue. *Dorshkind*, 835 N.W.2d at 303; *see also Berry*, 803 N.W.2d at 109.

There is no compelling need to recognize an implied cause of action where the legislature has provided a means to enforce or vindicate the public policy at issue. *See Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156 (Iowa 1996) ("Where the legislature has provided a comprehensive scheme for dealing with a specified kind of dispute, the statutory remedy provided is generally exclusive." (quoting 1A C.J.S. Actions § 14 n.55 (1985))), *abrogated on other grounds by Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), *overruled by Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023). For example, in *Ferguson v. Exide Technologies, Inc.*, we evaluated whether an employee could assert a claim for wrongful discharge in violation of public policy where the employer violated a comprehensive drug testing statute. 936 N.W.2d 429, 430 (Iowa 2019) (per curiam). We concluded the employee was barred from asserting the claim because the statute at issue provided a civil enforcement action to vindicate the right at issue. *See id.* at 436. "[W]hen the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary." *Id.* at 434–35.

The district court relied on our decision in *Ferguson* to conclude that section 70A.28 provides the exclusive remedy on the facts alleged here. We agree. Iowa Code section 70A.28(2) prohibits a person from discharging an employee "as a reprisal" for making a disclosure of information evidencing "a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Subsection (5) of

the statute provides the statutory right "may be enforced through a civil action." *Id.* § 70A.28(5). Subsection (5) then provides a comprehensive civil remedy to any employee subjected to unlawful reprisal, including damages and injunctive relief:

> *a.* A person who violates subsection 2 is liable to an aggrieved employee for affirmative relief including reinstatement, with or without back pay, civil damages in an amount not to exceed three times the annual wages and benefits received by the aggrieved employee prior to the violation of subsection 2, and any other equitable relief the court deems appropriate, including attorney fees and costs.

> *b.* When a person commits, is committing, or proposes to commit an act in violation of subsection 2, an injunction may be granted through an action in district court to prohibit the person from continuing such acts. The action for injunctive relief may be brought by an aggrieved employee, the attorney general, or a person providing human resource management for the state.

*Id.* § 70A.28(5)(*a*)–(*b*). This comprehensive civil remedy obviates the justification for recognizing a common law discharge claim here. As in *Ferguson*, when the legislature provides a civil cause of action "in the same statute that creates the public policy to be enforced, the civil cause of action is the exclusive remedy for violation of that statute." 936 N.W.2d at 435. Otherwise, claimants could circumvent the legislature's chosen statutory limits on damages in section 70A.28(5)(*a*) simply by filing a common law whistleblower claim.

Halbur concedes that his whistleblower claim is precluded by statute, but he alleges he should be allowed to proceed on his claim that Larson terminated his employment due to his refusal to participate in illegal activity. Specifically, Halbur contends that his refusal to authorize payment to BMI shows that he refused to participate in illegal activity. The district court rejected this argument, writing that "[Halbur] argues a distinction without a difference. If [Halbur] was refusing to commit an unlawful act, [Halbur] was doing so because he believed it was 'a violation of the law' or 'a violation of law or rule, mismanagement, a

gross abuse of funds, and/or an abuse of authority,' both of which [Halbur] alleges he communicated to Larson." (Citations omitted.)

We conclude the district court correctly dismissed Halbur's claim. We first note that it is highly questionable that Halbur's refusal to authorize payment to BMI was a refusal to engage in an illegal act. Even assuming that the BMI contract was procured in violation of the public procurement laws, at the time Halbur refused to authorize additional payments ABD was still party to a contract with BMI under which it was obligated to make payment until such time as the contract was set aside. Halbur's refusal was thus more of a unilateral decision that ABD should breach its contractual obligation and less of a refusal to engage in an illegal act. Halbur points to no statute authorizing him to unilaterally disallow payments to vendors still under contract with the state.

Setting that aside, Halbur's alleged refusal to engage in an illegal act is inextricably intertwined with his statutory whistleblower claim, and the statutory remedy is thus exclusive. Halbur's refusal to authorize additional payments was premised on his belief that additional payments were "a violation of the law" under section 70A.28. This is the same belief he had communicated to Larson. This case is thus distinguishable from *Jasper v. H. Nizam, Inc.*, because the plaintiff in *Jasper* did not have a statutory remedy encompassing her claim for wrongful discharge in violation of public policy. 764 N.W.2d at 759–60. Similarly, the plaintiff in *Fitzgerald v. Salsbury Chemical, Inc.* brought a lawsuit for wrongful discharge in violation of public policy also where no statute provided a civil remedy. 613 N.W.2d at 279. In contrast to *Jasper* and *Fitzgerald*, there is a statutory remedy here that covers the same conduct, or sufficiently intertwined conduct, asserted in Halbur's common law claim for wrongful discharge in violation of public policy. *See* Iowa Code § 70A.28(5). This is not a

merely theoretical point. Halbur in fact presented this theory to the jury in support of his statutory claim. At trial, Halbur presented evidence that his employment was terminated for refusing to authorize any additional payments to BMI. He repeatedly argued to the jury at closing that he was fired, in part, for refusing to "sign off on any more invoices." Halbur is not entitled to a second trial to get additional damages for a statutory claim on which he already prevailed and was awarded damages.

## IV.

For these reasons, we affirm the judgment of the district court.

**Affirmed.**

All justices concur except Mansfield, J., who files a dissenting opinion.

**Mansfield, Justice (dissenting).**

I respectfully dissent. Todd Halbur wasn't a whistleblower; he had an argument with his boss. Halbur's claim under Iowa Code section 70A.28 (2020) should have been dismissed at the outset. We read statutes as a whole, and a holistic reading makes clear that the recipient of the whistleblowing complaint has to be someone *other than* the complainant's supervisor who is the subject of that complaint. Because of this legal deficiency in Halbur's claim, I would reverse the jury verdict in this case and enter judgment for the defendant on the section 70A.28 claim.

As Stephen Larson sums up in his opening brief, "Halbur did not make the type of communication protected by section 70A.28—he did not disclose information to a proper party . . . ."

**I. Error Was Preserved.**

I would find that error was preserved. In the motion to dismiss, Larson argued,

> While Defendant Larson, as the Administrator of ABD, may qualify as a "public official," in the context of this specific case, it makes little sense for him to be the necessary "public official" for Plaintiff to disclose to in order to follow the § 70A.28 process considering Plaintiff's complaints were about alleged agency actions squarely in Defendant Larson's authority.

In his reply in support of that motion, Larson elaborated. Here are two paragraphs of Larson's extended argument:

> The very nature and language of this reporting requirement suggests that the employee who discloses this information, does so to a third party who is not his or her supervisor, and someone who is identified in the whistleblower statute. Otherwise, there would be no reason to include language in the statute about having to report whether the information was the "official position of the employee's immediate supervisor or employer." *See*[] Iowa Code § 70A.28(1)–(2).

Therefore, in this case, when the recipient of the information regarding wrongdoing (Larson) is also alleged to be the proponent of the wrongdoing (Larson), it appears that the statute would require the disclosure be made to be a third party (not Larson) to be eligible to plead the civil cause of action found in the Iowa Code § 70A.28. As such, Plaintiff fails to state a claim in Count III upon which any relief may be granted, and this count should be dismissed.

This argument was a focal point of the hearing on the motion to dismiss, and the district court ultimately rejected it, stating, "Plaintiff elected to whistle blow to a public official who happened to be his agency's administrator."

Shortly before trial, a hearing took place on motions in limine before a different judge. This judge was going to preside at trial. At the hearing, Larson's counsel stated, "[W]e're preserving the issue about whether Mr. Larson was a proper public official for plaintiff's claim . . . ." The district court responded, "To the extent that another judge in this case has ruled he is properly a public official for purposes of this case, that's the law in this case, and you are not waiving anything." The court continued, "[T]hat will be the way we proceed that [Larson's] proper, but nothing I am saying or will do in trial waives the argument that you raised in any motion to dismiss on that basis."

As the majority points out, Larson failed to move for a directed verdict or for a judgment notwithstanding the verdict. Certainly, the better practice would have been to do so. But I believe the question of whether Larson was a proper public official for purposes of this section 70A.28(2) civil action brought by his own subordinate was preserved for appeal by the foregoing proceedings on the record. That's the logical interpretation of what the district court did.

Indeed, it's the interpretation that *Halbur's attorney* gave to those proceedings. At oral argument before this court, our court aired the subject of error preservation thoroughly during the first fifteen-minute argument made by Larson's attorney. Even with the benefit of all that questioning, Halbur's attorney

continued to maintain that error had been preserved on the motion to dismiss. He began,

> This is an appeal from the motion . . . a pre-answer motion to dismiss, and that is the case because the defendant at trial did not file a motion for a directed verdict, did not file . . . a motion for judgment notwithstanding the verdict, and so what we are left with here is the pre-answer motion to dismiss.

Because the district court was a party to the pretrial stipulation preserving error on the motion to dismiss, this case presents no issue of unfairness to the trial court.[1]

**II. Under Iowa Code Section 70A.28(2), "Person" and "Public Official" Refer to Two Different People.**

Retaliation claims often appeal to people's general sense of fairness, but they can hamstring effective governance. Don't ask me, ask the United States Supreme Court. *See Egbert v. Boule*, 596 U.S. 482, 499 (2022) (Thomas, J., majority opinion) ("A plaintiff can turn practically any adverse action into grounds for a retaliation claim."); *id.* at 516–17 (Sotomayor, J., concurring in the judgment in part and dissenting in part) (noting the "elusiveness of a limiting principle" referenced in a prior case and adding that "First Amendment retaliation claims could potentially be brought against many different federal

---

[1]In addition, I disagree with the majority's recasting of our decision in *Schooler v. Iowa Department of Transportation*, 576 N.W.2d 604 (Iowa 1998) (en banc). That case does not stand for the proposition that "authority" objections—as opposed to other nonauthority objections—do not have to be renewed at trial. Here is what we actually said:

> The plaintiffs argue that the DOT failed to preserve error because it did not subsequently raise the issue of lack of authority in later motions. We find that the DOT properly preserved error by raising the issue in its motion to dismiss. The district court's decision on that motion was definitive and dispositive of the issue. Requiring a party to file additional motions when the district court has already addressed the precise issue in a prior ruling would be a waste of judicial resources.

*Id.* at 607. In short, *Schooler* focused on the lack of need "to file additional motions" when the trial court's decision was "definitive and dispositive." *Id.* That was the point we addressed, rather than a distinction between authority motions and other types of motions.

officers . . . to reach virtually all federal employees" (quoting *Wilkie v. Robbins*, 551 U.S. 537, 561 n.11 (2007))). Therefore, in interpreting an antiretaliation law, we must be faithful to the terms of legislation enacted by the general assembly, but we should read that language sensibly and in its entirety.

As I read section 70A.28(2), it refers to three *separate* actors: (1) an "employee" of the state who is the whistleblower; (2) a "person" who is the individual with supervisory authority over the employee; and (3) a recipient of the whistleblowing who can be "a member or employee of the general assembly," "the office of ombudsman," "a person providing human resource management for the state," or "any other public official or law enforcement agency." Iowa Code § 70A.28(2).

True, the statute doesn't expressly say that individuals #2 and #3 can't be the same person, but it also doesn't say they can be. If they are the same person, the law doesn't make sense. Thus, section 70A.28(2) protects a state employee from retaliation by a supervisor for making a "disclosure" so long as the employee reasonably believes in good faith that it amounts to "mismanagement" or an "abuse of authority." *Id.* But if the supervisor/subject of the whistleblowing complaint and the person who receives the whistleblowing complaint can be the same person, the statute takes on a breathtaking scope. For example, a state trooper who visibly objects to how the department of public safety is being managed could not be demoted as a practical matter. An employee of the general assembly could not be fired for challenging a supposed "abuse of authority" by a member of the general assembly.

So read, the statute would create a special disfavored class of supervisors within state government. Those supervisors would lack the flexibility of action that other supervisors possess. The disfavored class would include members or

employees of the general assembly, public officials such as directors of departments, and law enforcement personnel. For supervisors in that class, terminating or disciplining an insubordinate employee would not be a realistic option if the employee was complaining about "mismanagement" or "abuse of authority." *Id.*

As one can readily see, the logic of this statutory interpretation is entirely backward. If anyone *needs* flexibility, it is the legislators and public officials who make policy in this state and the law enforcement personnel who protect us.[2]

Significantly, section 70A.28(2) also protects the employee against reprisal "for a failure by that employee to inform the person that the employee made a disclosure of information permitted by this section." This too implies that the "person" and the recipient of the "disclosure of information" have to be separate individuals. *Id.*

Earlier this year, in *Teig v. Chavez,* 8 N.W.3d 484, 490–91 (Iowa 2024), we had to interpret an Iowa Open Records Act exemption for certain communications received by a government body from "persons outside of government." Invoking the Act, a private citizen had requested the job applications submitted by candidates for certain openings in the City of Iowa City. *Id.* at 488–89. Divorced from context, the Act's "persons outside of government" language would have shielded only the applications submitted to the city by persons *not holding government jobs*. We held, however, that it protected all *external* job applications, including the application of the successful candidate who had previously worked for another city. *Id.* at 494–95. In other words, we read "persons outside of government" logically to mean "persons

---

[2]It is also noteworthy that Iowa Code section 70A.29(1) contains a similarly worded counterpart for local government. So municipal officials and local law enforcement would have to do their jobs under the same restrictions.

outside of the government body that is the subject of the open records request." So too here, "person" means a person other than the recipient of the whistleblowing disclosure.

For these reasons, I respectfully dissent.[3]

---

[3]On the cross-appeal, unlike the majority, I would allow further consideration of one aspect of Halbur's common law public policy wrongful discharge claim. As I view the matter, Halbur needs an independent source of clearly defined public policy other than section 70A.28(2); otherwise, he is just circumventing the limits in that section. The only such source that Halbur cites is the Iowa competitive bidding law. *See* Iowa Code section 8A.311. Halbur claims he was terminated in part for refusing to perform an illegal act under that law. *See Carver-Kimm v. Reynolds*, 992 N.W.2d 591, 601–02 (Iowa 2023) (allowing a state employee's common law wrongful discharge claim to go forward "if, and only if, she can show she was terminated for complying with her statutory duty as lawful custodian to produce records that she had an obligation to produce").

But Halbur didn't have anything to do with the actual contracting process for the Beverage Merchandising, Inc. contract. As far as the payment of invoices is concerned, I believe the record supports only one instance where Halbur declined to sign off on an invoice—the June 26, 2018 invoice that Larson said Halbur would process after July 1. Halbur would have a common law claim "if, and only if," he can show that paying that invoice would have been an illegal act on his part and that he was terminated for refusing to perform that act. *Id.* at 602.